[Civ. No. 18999. Second Dist., Div. One. Dec. 11, 1952.]

CARPENTER PAPER COMPANY (a Corporation), Plaintiff, v. EDWARD S. KELLOGG, Respondent; ALFRED M. LEWIS, INC. (a Corporation), Appellant.

Thompson & Colegate for Appellant.

Hahn & Hahn for Respondent.

PATROSSO, J. pro tem.—While we are concerned here only with an appeal by the cross-defendant, Alfred M. Lewis, Inc., from a judgment rendered against it in favor of cross-complainant, Edward S. Kellogg, the somewhat confusing situation disclosed by the record makes necessary an extended statement of the pleadings, findings, and evidence as well as the proceedings in the trial court.

Plaintiff instituted this action against both respondent and appellant seeking to recover damages for breach of contract. The fourth amended complaint upon which the cause went to trial contains two counts, the first alleging that on October 11, 1948, the respondent "acting as the advertising agent and representative of" appellant employed plaintiff's assignor, Carter and Galantin, Inc. (hereinafter referred to as the "printers"), to make up and produce 26 separate series of "Recipe of the Week" cards, each series to comprise 300,-000 cards, the printers agreeing to furnish all material and labor to produce said cards *"all at one time"* for $3.56 per thousand; that later the printers were informed by respondent that he could not deliver the art work and copy in time for the printers to run the 26 series at one time in their Chicago plant but he would deliver the art work and copy for the first six series only to be produced in one run in the printers' Los Angeles plant, and that the art work and copy for the remaining 20 series would be ready in time for running at one time in their Chicago plant; that the printers agreed to split the run as aforesaid provided that the art work and copy were delivered in time to permit the running of all the remaining 20 series in their Chicago plant. After running the first six series the printers notified respondent to furnish the art work and copy for the last 20 series but that respondent failed to do so, delivering the art work and copy for only the next 10 series and in insufficient time to run the same at one time, and the printers were compelled to split the run of said 10 series by running numbers seven and eight as a separate run from the remaining eight series by reason of which the printers were compelled to purchase paper of a larger size and heavier weight than that specified in the order at an additional cost of $515.95; that each split incurred additional expense for overtime and other specified items in the amount of $3,452.70, making a total extra cost of $3,968.65, and that respondent and the printers agreed to compromise said extra costs by respondent's agreement to pay the sum of $3,199.90, of which no part has been paid.

The second count alleges that on January 15, 1949, respondent and appellant terminated and cancelled the contract hereinbefore mentioned without the printers' consent; that prior to the termination of the contract the printers had purchased paper to be used in the production of the last 10 series of cards, and upon termination of the contract they had in their possession a quantity of such paper costing $2,724.48, which paper was made especially to size and thickness for use in making the cards, and by reason of the limited demand for paper of such character, the best price the printers had been offered therefor was the sum of $1,000, resulting in damage to plaintiff in the sum of $1,724.48. It is further alleged that if the printers had been permitted to complete the contract, they would have realized a profit thereon of $1,500, to their damage in this sum.

Separate answers were filed to the complaint by respondent and appellant, each denying the material allegations thereof. At the same time respondent filed a cross-complaint against appellant likewise containing two causes of action. The allegations of the first count may be disregarded as the trial court made no findings thereon, and those contained in the second need not be set forth here as they will sufficiently appear from the trial court's findings substantially in accordance therewith as hereinafter set forth in detail.

At the close of the plaintiff's case the court granted appellant's motion for a nonsuit upon both causes of action, and granted respondent's motion for a nonsuit as to the first cause of action but denied the same as to the second cause of action. As disclosed by the clerk's transcript, minute orders were duly entered granting the nonsuits as indicated. However, some three months after the signing of findings and judgment, the court caused a *nunc pro tunc* order to be entered correcting or amending the minute order as to respondent's motion so as to read that the motion was denied. In granting the nonsuit of the respondent as to the first cause of action the trial court stated that there was no evidence to support the allegations with respect to the alleged breach of contract by respondent in the particulars specified therein. Thereafter, however, further discussion was had between court and counsel for the plaintiff and respondent as to whether or not the first count sufficiently stated a cause of action upon the theory of an account stated, at the conclusion of which the court observed, in effect, that he would reserve a ruling upon this point.

Viewed in the light most favorable to the respondent and indulging in all reasonable inferences deducible therefrom, the evidence, insofar as material to the questions presented here, discloses the following:

Appellant is engaged in the wholesale grocery business while respondent conducts an advertising agency. Appellant's principal customers or at least a substantial portion thereof comprise a group of more than 700 independent retail grocers who operate under the common name or designation of Orange Empire Stores. As a means of enhancing its business, and, as an incident thereto, that of these retail outlets, appellant determined to embark upon an advertising and publicity campaign and to that end in the spring of 1948 engaged the services of respondent under an oral agreement whereby appellant promised to pay respondent for his services a monthly consultation or publicity fee of $200 and $10 (later reduced to $8.23) per hour for each hour that respondent and members of his executive staff devoted to such advertising projects as might be determined upon by the parties. The agreement between the parties specified no fixed period of duration, and it is conceded that, until the parties embarked upon the Recipe of the Week program hereafter to be mentioned, it was terminable at the pleasure of either.

Prior to the time of respondent's employment by appellant the former had submitted to the latter a written memorandum containing various suggestions with respect to the types of advertising that might be undertaken in appellant's behalf, included within which there was a reference to a "give-away program" therein described as "Recipe of the Week card." Though at the time but briefly outlined, as it evolved into final form the plan contemplated the printing of a series of 26 weekly recipe cards in quantity of 300,000 each, and the procuring of 26 food manufacturers, each of whom would assume the cost of printing one series of such cards. These appellant was to sell to members of the Orange Empire Stores for the sum of one cent each, the proceeds from which were to be used to defray the cost of the program, and the latter in turn were to undertake to distribute the same to their customers and members of the public generally. In conjunction there was to be a radio program and a weekly contest with prizes awarded for the best letters received upon the subject, "I like this week's recipe best because———.'

Following respondent's employment the parties proceeded to give consideration to the adoption of such a program. To this end respondent and Mr. Lewis, president of the appellant corporation, journeyed to San Francisco and met with officials of California Packing Corporation, to whom the proposed plan was outlined. In the ensuing discussion the question arose as to the cost of printing 300,000 of such recipe cards and, upon referring the matter to the advertising department of that corporation, an estimate was received of "five or six thousand dollars." All parties agreed that this figure was prohibitive and would render the plan impractical of adoption. Thereafter respondent advised appellant that he had ascertained that if the entire series of 26 cards was printed at one place, they could be furnished at the price of $1,275 to each manufacturer participating in the plan, including not only the cost of printing but the work of respondent in connection therewith, involving the writing of copy, art work, color separation, etc. Mr. Lewis thereupon stated that upon this basis no problem would be involved in securing the necessary 26 manufacturers. Appellant and respondent thereafter held meetings with both food manufacturers and members of the Orange Empire Stores to whom the plan was explained and their participation solicited, it being stated that the plan would continue for a period of 26 weeks. It is undisputed, however, that Mr. Lewis repeatedly stated to respondent that appellant would have nothing to do with the printing of the cards and that this was to be the sole responsibility of respondent. It is also an admitted fact that, in outlining the plan to the manufacturers whose participation was solicited, it was expressly stated by respondent that, while the cards could be obtained from the respondent for the price indicated, they were not obligated to do so but were at liberty to procure the same from other sources provided they conformed to certain specifications as to size, art work, and finish. Following this and sometime in September, 1948, the appellant decided to proceed with the program and so advised respondent, it being understood that the respondent would undertake the printing of the cards, and that respondent was to bill each participating manufacturer therefor and not appellant.

Two days prior to the time that respondent entered into a contract with the printers for the printing of the cards he requested from Mr. Lewis a purchase order therefor to

which Mr. Lewis replied that this was not necessary, that his word was good, and that he could and would procure the necessary 26 manufacturers to participate in the program. Subsequently and before respondent ordered the printing of the cards, a member of respondent's staff had a further conversation with Mr. Lewis in which a request was again made for a purchase order for the 26 recipe cards to which Mr. Lewis replied that ''we don't give purchase orders. You don't need a purchase order.'' Respondent's employee then stated to Mr. Lewis that respondent was afraid that 26 manufacturers could not be obtained and asked Mr. Lewis, ''Will we have the whole 26 then? Can we go ahead and order the cards?'' and Mr. Lewis replied, ''Yes, you will get the 26. I take the responsibility for getting the manufacturers. You don't have to worry about that.''

At this time the parties had secured promises of participation from only six or eight food manufacturers, but nevertheless immediately following the conversation last mentioned, the respondent proceeded to enter into a contract for the printing of the cards. This was evidenced by a written purchase order issued by the respondent to Carter and Galantin, Inc., dated October 8, 1948, reading, ''300,000 each *4 units.* (balance of 22 to be delivered shortly)'' and contained the further statement, ''3.56 per M—f.o.b. Los Angeles. *It is our understanding that there will be some reduction if higher quantity than 12 units ordered at one time.*'' Also, ''Cards must be printed and delivered on Monday, November 8, 1948.'' (Emphasis added.)

The program, while at first successful, shortly seems to have lost its appeal, with diminishing interest upon the part of the members of the Orange Empire Stores, and as a result appellant determined to terminate it at the conclusion of the 16 weeks for which manufacturers had already been secured, although stating to respondent, when advising him of this decision, that the 10 additional manufacturers necessary to continue the program for the contemplated 26 weeks were obtainable. Although the program thus terminated on or about February 20, 1948, respondent continued to render services to appellant in connection with general publicity and advertising until June, 1949, for which he was fully compensated at the agreed rate.

At the close of all of the evidence and following the argument of counsel, the trial judge reiterated that the evidence did not sustain the allegations of plaintiff's first cause of

action to the effect that respondent had breached his contract with the printers, and hence that his finding thereon would be against the plaintiff, but at the same time stated that one of the issues remaining to be determined was "whether or not there was an account stated," between respondent and the printers.

Thereafter the trial court made and entered findings and judgment upon the complaint and separate findings and judgment upon the cross-complaint. With respect to the first count of the complaint the court, despite the fact that it had stated that there was no evidence to support the allegations thereof except possibly insofar as they might relate to an account stated, nonetheless found the facts to be substantially as therein alleged with the modification, however, that the agreement of compromise between the printers and respondent pleaded therein included not only the items of damage in the first cause of action set forth but also the printers' loss arising from the sale of the paper claimed in the second count, which the court found to be in the sum of $1,407.92.

With respect to the second cause of action in plaintiff's complaint, the court found the facts substantially as alleged therein; that the loss sustained upon the resale of the paper was $1,407.92 and that this was included in the settlement effected between the printers and respondent, as set forth in its findings upon the first cause of action, but made no finding with reference to the allegation that by reason of the cancellation of the contract plaintiff's assignor had sustained damage by way of loss of profits in the sum of $1,500, although in his memorandum decision the trial judge stated that there was no evidence to sustain the allegation of damage in this respect.

Upon the issues raised by the cross-complaint and the answer thereto the court found, as to the second cause of action thereof, that the parties agreed to proceed with the "Recipe of the Week" program "as originated and developed by" respondent, that the program should be undertaken for a period of 26 consecutive weeks commencing with the week of November 15, 1948; that respondent should produce and supervise the program from the time of its adoption through the entire period of 26 weeks; that appellant would be responsible for obtaining 26 food manufacturers who would participate in the program and would provide the recipe cards for each of 26 weeks, and that appellant

would procure such 26 food manufacturers in sufficient time so that they could furnish the necessary material, content, and art work to permit the printing of 300,000 recipe cards for each of said 26 weeks at one printing; before the initiation of the program respondent advised the appellant that, in order to make it possible for the food manufacturers who were to participate in the program to purchase the same at the lowest possible cost, respondent would enter into a contract with Carter and Galantin, Inc., for the printing of all the 26 recipe cards at one time at a price of $1,068.00 for each issue of 300,000 cards; that respondent would do the necessary art work and other work incidental to the production of the cards and would sell the same to each participating manufacturer for the sum of $1,275 for each issue of 300,000 cards and respondent would retain for himself the difference between the printing costs thereof and the price charged the food manufacturer; that appellant knew that respondent would enter into the contract with Carter and Galantin, Inc., for the printing of the cards at one time and that its failure to perform its contract with respondent would in turn cause a breach of respondent's contract with Carter and Galantin, and a consequent loss to respondent; that the program commenced with the week of November 15, 1948, continued for a period of 16 weeks and appellant secured food manufacturers to participate therein and purchase recipe cards therefor for such period but appellant failed to procure the food manufacturers for said 16 weeks of the program in sufficient time to permit the printing of the recipe cards for said 16 weeks at one time, and that by reason of the delay in procuring said manufacturers the printers were required to split the printing of the cards into three different printings, the first consisting of six cards, the second of two cards, and the third of eight cards; that at the end of the 16-week period the program was terminated by the appellant and that such termination constituted a breach of the contract between respondent and appellant, by reason of which respondent became liable to the printers in the sum of $3,968.65 together with whatever loss the printers might sustain upon the sale of the paper purchased for the printing of the last 10 series of recipe cards and for loss of profits which the printers would have realized if the program had not been cancelled; that upon the resale of the paper by the printers they sustained damage in the sum of $1,407.92 and that on or about February 1, 1949, re-

spondent settled his dispute with the printers for the damages suffered by them "in the amount of $3,968.65, plus the loss of profits, for the sum of $3,199.99," which settlement was fair, reasonable, and just and to the advantage of both appellant and respondent; that, by reason of appellant's breach of its contract with respondent, the latter sustained damage as follows: (1) In the sum of $3,199.90 together with interest thereon at the rate of 7 per cent per annum from February 1, 1949; (2) the sum of $2,070 profit respondent would have received upon the sale of the recipe cards for the remaining 10 weeks of the program; (3) the sum of $213.60 which respondent would have received as a discount upon the printing bills upon the cards to be printed for the remaining 10 weeks; (4) the sum of $893.60 which respondent would have received for the services of its executives' time for the services for the 10 remaining weeks of the program; and (5) the sum of $1,123.90 which respondent would have received for the services of his organization in the preparation of radio programs and in the promotion of the program for the remaining 10 weeks.

Appellant assails substantially all of the foregoing findings as unsupported by the evidence, but we confine our consideration to those only which we deem necessary to a proper disposition of the appeal.

We direct our attention first to the finding that the splitting of the printing of the 16 cards into three runs constituted a breach of the contract between respondent and the printers, by reason whereof the printers sustained damage in the sum of $3,968.65, for which respondent became liable, and that such breach and consequent damage was occasioned by the failure of appellant to procure manufacturers for the 16 weeks' program in sufficient time to permit the printing of all the cards for said 16 weeks at one time.

This determination appears inexplicable in light of the trial judge's comments, when purporting to grant respondent's motion for a nonsuit as to plaintiff's first cause of action and repeated at the conclusion of all the evidence, with which we are in complete accord, that there was no evidence to sustain the charge in plaintiff's complaint to this effect. If this is true, it is inconceivable how the trial court could conclude that the appellant became obligated to respondent in damages therefor. If the splitting of the printing of the 16 cards did not constitute a breach of *respondent's contract*

*with the printers*, obviously there is no basis for the wholly inconsistent finding that appellant occasioned a breach thereof in this particular.

There was a total absence of any proof, and counsel for respondent correctly so maintained throughout the trial, to establish that the so-called splitting of the run of the 16 cards was in violation of respondent's contract. However, if we were to assume otherwise, there is not a particle of testimony to be found in the record that appellant was in anywise responsible therefor. It is undisputed that appellant was to have nothing whatsoever to do with respect to the printing of the cards but that this was the sole responsibility of the respondent. Accepting respondent's own testimony, the sole obligation of the appellant was to procure the participation of 26 manufacturers who might become purchasers of the recipe cards from the respondent. If respondent undertook, as he did, to direct the printing of only four series of cards in the first instance, and this at a time when only six or eight manufacturers had indicated an intention to participate, it is evident that respondent as well as the printers then knew that 16 series of cards could not be run at the same time. Moreover there is no proof that such was the agreement between respondent and the printers. As the trial judge observed, there is a complete absence of evidence as to why the printing was split into three runs, although there is some suggestion in the record that this, in part at least, may have resulted from the delay occasioned by the failure of the manufacturers or some of them to furnish the necessary material or to promptly approve the proofs, but as already indicated, there is nothing to support the charge that appellant was responsible therefor.

Despite the finding just discussed and which we have concluded to be without support in the evidence, it would appear that the court's ultimate determination that appellant is liable to respondent in the sum of $3,199.90 for the damage found to have been sustained by the printers rests solely upon the fact that respondent, by way of settlement or a compromise, promised to pay to the printers this amount in satisfaction of their demands, and the finding that such settlement was fair, reasonable, and just and to the advantage of both respondent and appellant. Conceding that, under familiar principles, the trial court properly concluded that this agreement of settlement was binding upon the respondent

even though it was later ascertained that the sum agreed upon was in excess of that which respondent was legally obligated to pay (5 Cal.Jur., p. 391, § 7), it does not follow as a necessary consequence that such settlement was binding upon the appellant, which was not a party to and did not consent thereto.

The legal principle by which the liability of the appellant to respondent upon this theory is to be tested is, we apprehend, the same as that applicable in the case of an indemnitee who seeks reimbursement from his indemnitor for a payment made by him in discharge of a claim indemnified against. (42 C.J.S., p. 594, § 20.) ▮ While such an indemnitee is not bound to submit to suit before paying the claim, if he pays without such suit, he is under the necessity, as a condition of recovery from his indemnitor, of proving that he was liable for the amount thus paid. (13 Cal.Jur., p. 993, § 13; 42 C.J.S., p. 603, § 25; p. 625, § 35.) ▮ Here the claim of the printers against respondent which the latter undertook to settle comprised three separate items; (1) the alleged damage sustained by reason of the splitting of the run of the 16 cards in the claimed sum of $3,968.65; (2) the loss incurred in the resale of the paper; and (3) the profits which would have been realized if the last series of 10 cards had been printed as originally contracted for. As to (1), we have already seen that the evidence wholly fails to establish any liability of respondent therefor in any amount, and as to (3), while no finding was made thereon, the trial judge stated in his memorandum decision that the claim was unsupported by the evidence, with which statement we are in accord. As to (2), the trial court found that the loss incurred by the printer in the resale of the paper was the sum of $1,407.92. This last-mentioned finding alone may be said to be supported by the evidence, and is the full measure of the liability incurred by respondent by reason of the breach of his contract with the printers, as well as that of appellant to respondent if the former is answerable therefor. The facts recited likewise suffice to demonstrate the lack of support for the court's announced conclusion that the settlement was as to the appellant "fair, reasonable, and just" when we consider that the amount thereof is more than twice the maximum which the trial court found that the printers would otherwise have been legally entitled to recover against respondent.

■ We consider next the finding that the parties agreed that respondent was to be employed as advertising agent of appellant to produce and supervise the Recipe of the Week program for a period of 26 weeks, and that the abandonment of the program by, appellant after 16 weeks constituted a breach of such agreement.

If the trial court's finding in this regard is to be treated as declaring that the parties entered into an express contract or agreement of employment for a period of 26 weeks for the purpose stated, we fail to find in the record any evidence supporting the same. Both respondent and appellant unequivocally testified that at no time was there any agreement between them that respondent's employment by appellant was to continue for any definite or fixed period. The only evidence to which counsel for respondent refer as supporting a finding of an express contract of employment for a fixed term is the statement attributed to Mr. Lewis by respondent·made at a meeting or meetings held for the purpose of soliciting the participation of some of the retail stores, that "we have retained the services of the Kellogg Company to put on a recipe of the week program for 26 weeks." This, however, is at most an admission which is completely dissipated by the testimony of both parties which in our view clearly discloses that the services rendered and to be rendered by respondent in this connection were but incidental to and contemplated by a general contract of employment having no fixed duration.

The finding under discussion must find support, if at all, upon the proposition, for which respondent contends, that even though the original contract by which respondent was employed was for no fixed period of time, a special contract of employment for a definite term of 26 weeks covering services to be rendered in connection with this specific program arose by implication under the circumstances here.

■ The contract between appellant and respondent was one calling for the rendition of personal services, and the general rule with reference to contracts of this character is that where no period is fixed for the duration of the contract, it is terminable at the will of either party except where the employment is coupled with an interest or is entered into upon an independent consideration, in either of which events it is terminable only after a reasonable time. (*Thacher* v. *American Foundry*, 78 Cal.App.2d 76, 83-84 [177 P.2d 322].) The contract here falls within neither of the exceptions, and we see nothing in the nature of the agreement between the

parties which necessarily implies that, simply because respondent during the period of his employment, which was otherwise terminable at will, was directed to render services in connection with a particular plan of advertising which at its inception was contemplated to endure for a fixed time, a special contract apart from the original contract of employment thereupon came into being, whereby respondent was employed for this specific purpose and for the definite period contemplated for the duration of the particular project.

The services rendered and to be rendered by respondent in connection with the Recipe of the Week program did not in their nature differ from those performed by him with respect to other forms and types of advertising adopted by appellant from time to time both before and after this particular program was in effect. All such services were rendered under the original agreement which admittedly had no fixed period of duration, and for these respondent was compensated in the same manner and at the same monthly and hourly rate as then agreed upon. The particular program in question was simply one of the means or methods of advertising which was resorted to as contemplated by and in connection with which respondent's services were required under the terms of his original employment. Indeed, as we have already noted, this particular program was suggested by respondent at the very inception of his employment by appellant. If respondent's position be accepted as correct, it would necessarily follow that every time appellant embarked upon and required the services of respondent in connection with a different advertising program which at its inception was contemplated to endure for a fixed period, a special contract of employment came into being for the specific purpose and the fixed period thus contemplated. With this we cannot agree.

Counsel in support of their contention cite a number of cases which they assert are to the effect that "even in the absence of a definite agreement the duration of a contract of employment may be implied from all of the surrounding circumstances." Without pausing to consider whether they support the proposition as thus stated, a cursory examination thereof readily discloses that they bear no factual resemblance to the case at bar. Typical of these is the case of *Wittman* v. *Whittingham*, 85 Cal.App. 140 [259 P. 63], which involved an agreement whereby the respondent was employed by the appellant as an accountant and general manager at a specified

weekly salary with the right to purchase a designated number of shares of stock in a corporation to be organized by appellant for which he was to execute his note for $4,800 but which he was not to be required to pay, it being *expressly stated that respondent "should remain in the employ of appellant until the dividends and profits of the stock were sufficient to pay off the note"* (p. 142), at which time the note was to be cancelled and the certificate evidencing the shares delivered to the respondent. Thus it is apparent the contract there involved itself fixed the duration of respondent's employment without any need of resorting to implication. The contention was not that the contract failed to specify the duration of the employment, but that as so stated it was indefinite because of the uncertainty as to the time when the event which marked its termination would occur. The court quite properly rejected this argument, but its decision affords no support to respondent's contention here where, as we have seen, the services in connection with the particular program were incidental to and comprehended by a general contract of employment terminable at the will of either party.

The judgment is reversed, and the cause remanded for a new trial in accordance with the views herein expressed.

White, P. J., and Drapeau, J., concurred.

A petition for a rehearing was denied January 5, 1953, and respondent's petition for a hearing by the Supreme Court was denied February 5, 1953.