**CENTER STATE FARMS,**
**Plaintiff–Appellee,**

v.

**CAMPBELL SOUP COMPANY; Herider Farms, Incorporated, Defendants–Appellants.**

No. 94–1491.

United States Court of Appeals,
Fourth Circuit.

Argued March 6, 1995.

Decided July 6, 1995.

**ARGUED:** Forrest Arthur Hainline, III, Hainline & Associates, Washington, DC, for appellants. Edwin Russell Jeter, Jr., McNair & Sanford, P.A., Columbia, SC, for appellee.

Before NIEMEYER and HAMILTON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

Affirmed by published per curiam opinion. Judge HAMILTON wrote a dissenting opinion.

## OPINION

PER CURIAM:

In September 1983, Campbell Soup Company and Center State Farms orally agreed to a business relationship under which Center State Farms would take possession of flocks of new born turkeys, grow the turkeys for several months, and return them to Campbell Soup for use in its food products. In early 1991, Campbell Soup ended the rela-

tionship, prompting Center State Farms to sue for breach of contract. The case was submitted to a jury which awarded Center State Farms $150,000 in damages. This appeal followed, and we affirm.

Campbell Soup's arguments raise three broad questions: (1) Was the oral contract alleged by Center State Farms unenforceable by reason of the South Carolina Statute of Frauds or by the integration clause of individual written turkey contracts signed separately for each flock placed with Center State Farms? (2) Did Center State Farms retain standing to sue under the oral contract after leasing its turkey-growing facilities to independent contractors who assumed the turkey growing responsibilities? (3) Was the evidence sufficient to permit a jury to find that Center State Farms performed its duties satisfactorily?

Center State Farms presented evidence at trial that it agreed to grow turkeys for Campbell Soup and to make an initial investment of approximately $150,000 to convert its chicken houses to grow turkeys based on Campbell Soup's agreement to continue the relationship indefinitely. Center State Farms contends that Campbell Soup orally promised "to provide poults, feed and medicine and pay for grown turkeys as long as Center State performed satisfactorily." Pursuant to the alleged arrangement, Campbell Soup placed the first flock of turkeys with Center State Farms in December 1983 at which time the parties signed a "Turkey Contract" for that particular flock. The Turkey Contract provided that the poults which were delivered to Center State Farms remained the property of Campbell Soup, that Center State Farms would grow the turkeys for a period of 8 to 30 weeks, and that it would deliver the grown turkeys to Campbell Soup when Campbell Soup came for delivery. The parties agreed that the written terms of that agreement comprise "the entire agreement between the parties." As each flock was subsequently delivered to Center State Farms, an individual written Turkey Contract was signed. During the course of dealing that followed, Center State Farms simultaneously grew three flocks of turkeys but in different stages of development, and it cycled about five to six flocks per year through its facilities.

■ Campbell Soup contends that the oral agreement claimed by Center State Farms was unenforceable under South Carolina's Statute of Frauds because it "is not to be performed within the space of one year from the making thereof." S.C.Code Ann. § 32–3–10. Because Center State Farms testified that it did not expect to recoup its initial investment "for approximately 20 years," Campbell Soup argues the oral contract was "not to be performed" within one year and therefore is unenforceable.

■ We disagree with Campbell Soup's interpretation of the nature of the contract. The contract claimed by Center State Farms was indefinite in time and was to continue so long as Center State Farms performed satisfactorily. Under South Carolina law, such an arrangement is terminable at will, subject to reasonable notice. *See Carolina Cable Network v. Alert Cable TV, Inc.,* 447 S.E.2d 199, 201 (S.C.1994). A contract terminable at will does not fall under South Carolina's statute of frauds. *See Weber v. Perry,* 201 S.C. 8, 21 S.E.2d 193, 194 (1942). Even though the contract was terminable at will, we agree with Center State Farms' contention that the contract was enforceable for a reasonable period because, in addition to providing a turkey growing service to Campbell Soup, it made a permanent capital investment in the turkey-growing operation which provided "independent consideration" for the agreement. Under South Carolina law, independent consideration converts this terminable at will contract to one for a reasonable period of time to enable Center State Farms to recoup its investment. *See Weber,* 21 S.E.2d at 194–95; *cf. Orsini v. Trojan Steel Corp.,* 219 S.C. 272, 64 S.E.2d 878 (1951) (denying duration enforcement of at-will employment contract where no capital invested). This was the theory under which Center State Farms presented its case to the jury, and the district court properly instructed the jury on the South Carolina law of contracts for an indefinite period.

■ Campbell Soup also argues that the integration clause of the individual turkey

contracts precludes consideration of evidence about an overarching oral agreement. Under South Carolina law, the issue of whether an individual contract containing an integration clause comprises the entire relationship between parties is a factual question of intent, and evidence of terms understood by the parties but not covered by the contract is probative of that intent. *See Rentco v. Tamway Corp.,* 283 S.C. 265, 321 S.E.2d 199, 201 (App.1984). In this case, there was ample evidence for a jury to conclude that the overall arrangement between the parties was significantly broader than that contained in each individual Turkey Contract. For example, Center State Farms showed that the Turkey Contracts did not include specific arrangements for the annual number of flocks that Center State Farms would receive, the continuity of use of the "grow-out" houses, or the conversion and equipping of the houses. Nor did these Turkey Contracts provide for loading costs, propane costs, or other basic costs incidental to the parties' relationship. In short, we conclude that the evidence was sufficient to permit the jury to find that each individual Turkey Contract did not constitute the entire arrangement between the parties and thus each integration clause of these individual contracts did not preclude evidence of an overarching oral agreement between the parties.

■ Campbell Soup next argues that Center State Farms relinquished any rights in the turkey-raising arrangement and therefore lacked standing to sue for breach of contract when Campbell Soup shut down its turkey processing operation in 1991. Campbell Soup notes that in December 1986 Center State Farms stated that it did not intend to take any more flocks of turkeys, and thereafter it never signed any individual Turkey Contract. Center State Farms confirmed this point in two similar letters, the latter of which states:

I want to confirm by this letter what I previously advised you, that is, that I do not intend to contract to grow out another flock of turkeys. This has been my position since the middle of last December and has not changed.

Center States Farms has had difficulty justifying continuing our turkey operations ever since [Campbell Soup] changed its contracting formula in the latter part of 1985. This came to a head this past December.

Beginning in January 1987, a tripartite arrangement was reached between Campbell Soup, Center State Farms, and three independent farmhands who were willing to grow turkeys. Center State Farms entered into "leases" with the independent farmhands in which they took full responsibility, as independent contractors, for growing the turkeys. The farmhands paid Center State Farms for use of the growing facilities and signed the individual turkey growing contracts with Campbell Soup upon delivery of each flock. Center State Farms also entered into a letter agreement which was signed by each independent farmhand and sent to Campbell Soup, providing in part:

I hereby authorize[d] [Campbell Soup] to make all payments due to [independent grower] in connection with the turkey production *owned by Center State Farms* at Eastover, S.C., payable jointly to [grower] and Center State Farms.

(Emphasis added).

Campbell Soup argues that this new arrangement in January 1987 effectively removed Center State Farms from turkey growing, so that it had no basis to complain when Campbell Soup terminated its turkey operations. While Campbell Soup points to some evidence supporting its position that Center State Farms relinquished its rights under the arrangement with Campbell Soup, Center State Farms points to contrary evidence which supports the contention that while Center State Farms initially threatened to terminate its relationship with Campbell Soup, the two parties "settled" their differences with the tripartite arrangement signed by the independent growers. Specifically, Center State Farms emphasizes that the letter agreement sent to Campbell Soup refers to "the turkey production *owned by* Center State Farms." Indeed, Campbell Soup's own witness testified that that phrase addresses *future flocks* to be delivered after the January 1987 arrangement was entered.

Center State Farms presented testimony that as far as it was concerned, its overall relationship with Campbell Soup did not change in January 1987, and Center State Farms was "still obligated to perform" thereafter. Center State Farms' general partner testified that Center State Farms still had a contractual relationship with Campbell Soup until Campbell Soup terminated the relationship without adequate notice and without providing Center State Farms an adequate opportunity to recoup its initial $150,000 investment.

Even though both sides presented evidence raising further questions about the nature and extent of the parties' relationship after 1987, this remained a factual question which the jury could resolve either way. We cannot say that the evidence is so one sided that we must determine as a matter of law that Center State Farms terminated the contractual relationship in January 1987, thus depriving it of any standing to sue Campbell Soup for shutting down the turkey growing operations in 1991.

██ Finally, Campbell Soup contends that Center State Farms could not have been performing this oral contract "satisfactorily" when it refused for three and one-half years after 1987 to grow turkeys. This position, however, ignores Center State Farms' evidence that it delegated its turkey growing obligations to independent farmhands, with Campbell Soup's approval, while retaining the ultimate responsibility under the arrangement. Again, it is not our role to resolve such factual conflicts, but only to determine whether evidence was presented which was sufficient to support the jury's verdict. Whether we would reach the same result reviewing the evidence *de novo* is irrelevant because we are satisfied that adequate evidence appears in the record to support the jury's verdict. Accordingly, the judgment of the district court is

*AFFIRMED.*

HAMILTON, Circuit Judge, dissenting:

Concluding that the district court erred in entering judgment on the jury verdict in favor of Center State Farms (Center State),

I respectfully dissent. My analysis compels me to conclude that the district court should have dismissed this suit on the basis that Center State lacked standing to prosecute this action against Campbell Soup Company (Campbell). Alternatively, even indulging the contention that Center State had standing, the contract was terminable at will and the notice terminating the contract was reasonable. In the alternative, therefore, the district court should have entered judgment as a matter of law in favor of Campbell.

## I.

### A.

I recite the facts that the majority ignores. Center State was a partnership formed by Robert Scarborough (Scarborough) and his family for the purpose of operating a farm. After Center State's contract to produce chickens for another corporation ceased, Scarborough, in 1983, met with Earle Rowland (Rowland) of Campbell to discuss the possibility of Center State's converting its chicken-houses into buildings suitable for raising turkey poults to supply to Campbell's Sumter, South Carolina plant. Rowland gave Scarborough some handwritten schedules prepared for another poult-raiser that contained estimates of expenses and income for raising turkey poults. The figures in these schedules were represented to be mere estimates and in no way guarantees of payment or performance; moreover, these schedules were subject to change because the contracts to raise the turkey poults were on a flock-to-flock basis. Scarborough testified that his meeting with Rowland culminated in an oral contract under which Campbell was to provide Center State with five or six flocks of turkey poults per year and pay Center State for raising the turkey poults to maturity. *As its consideration, Center State spent approximately $150,000 in connection with renovating its chicken-houses in order to grow the turkey poults—roughly $134,000 on capital and $15,000 on labor.*

This oral contract between Campbell and Center State as negotiated by Rowland and Scarborough is the basis for this litigation. Scarborough testified repeatedly that with

respect to duration of this oral contract, "as long as [his] performance was satisfactory, [the parties] would continue doing business." (J.A. at 96). When asked on direct examination what Rowland said the duration of the contract was to be, Scarborough never answered as to what Rowland said, but stated that he concluded the contract "would be a continuing thing as long—as long as our performance was satisfactory." *Id.* at 98. Scarborough also testified, however, that the contract would not last "forever." *Id.* According to Scarborough, therefore, the contract was of indefinite duration and contingent on satisfactory performance.

### B.

Commencing December 3, 1983, Center State and Campbell entered into a series of written "Turkey Contracts," which covered a single flock of turkey poults and were therefore on a flock-to-flock basis; thus, each time a new flock of turkey poults arrived from Campbell, a new turkey contract was executed. These turkey contracts set out general terms between Center State and Campbell: for instance, the turkey contracts provided that Center State would grow turkeys of suitable weight in accordance with federal law; the turkeys would be of good quality; Campbell had the right to inspect the turkeys; and the turkey contracts provided a method for calculating Center State's compensation. These turkey contracts specifically provided that the turkeys would remain Campbell's property, and Campbell would not be responsible for raising the turkey poults. Each turkey contract contained a merger clause, printed in all capital letters and appearing immediately before the signature lines:

> ENTIRE AGREEMENT: THIS CONTRACT IS SUBJECT TO THE TERMS AND CONDITIONS ON THE FRONT AND BACK AND CONTAINS THE ENTIRE AGREEMENT BETWEEN THE PARTIES. IT CANNOT BE CHANGED OR ADDED TO EXCEPT IN WRITING SIGNED BY [CENTER STATE] AND BY [CAMPBELL'S] PRESIDENT OR VICE PRESIDENT. THIS PARAGRAPH IS SEPARATELY SIGNED[.]

*Id.* at 493. While these turkey contracts generally set out the parties' agreement, they did not provide all of the terms on which the turkey poults were to be raised, such as purchasing propane to heat the turkey poults. These turkey contracts were form contracts that Campbell prepared by typing "Center State Farms, Inc." on the line marked "Grower." From December of 1983–December 11, 1986, these turkey contracts were signed by Scarborough, and he also wrote, by hand, "Center State Farms, Inc." next to his signature.

### C.

By December 12, 1986, however, Center State declined authoritatively to enter into any further negotiations with Campbell. On January 22, 1987, Scarborough wrote to Mr. Watlington of Campbell:

> This letter will confirm our telephone conversation of today in which I advised you that *I would not sign for or assume any obligation in connection with the new flock of turkeys which I understand you plan to deliver on Saturday, January 24, 1987. This is consistent with what I have previously advised you as early as January 5, 1987 and since that date.*

*Id.* at 636 (emphasis added). Again on February 11, 1987, Scarborough wrote:

> *I want to confirm* by this letter what I previously advised you, that is, *that I do not intend to contract to grow out another flock of turkeys. This has been my position since the middle of last December and has not changed.*

*Id.* at 639 (emphasis added).

Rather than enter contracts with Center State, *Campbell entered into contracts with Moses Dix (Dix) and William Kirby (Kirby), lessees of Center State, who agreed to raise the turkey poults.*[1] Dix and Kirby entered into lease agreements with Center State that provided in pertinent part:

Dix.

---

1. Another lessee, William Coffey, was a lessee for only a short period of time and was replaced by

*Nothing contained in this Lease shall be construed as creating a partnership or joint venture between[Center State] and Tenant, or between [Center State] and any other party,* or cause [Center State] to be responsible in any way for the debts or obligations of Tenant or any other party.

*Id.* at 614, ¶ 2; 629, ¶ 3 (emphasis added). The leases also provided:

Tenant shall maintain a normal and regular flow of flocks in production, and shall continually operate the business on the leased premises in a diligent and prudent manner throughout the term of this lease....

In no event shall [Center State] have any responsibility to continue the processing of any flocks or fowl in production upon termination of this Lease, how ever [sic] terminated.

*Id.* at 617, ¶¶ 13–14; 632–33, ¶¶ 13–14. These leases recognized that *Dix and Kirby contracted with Campbell:* "[t]enant shall authorize and request *[Campbell] (the corporation with which Tenant is contracting* to grow out and market turkeys)...." *Id.* at 613, ¶ 2; 629, ¶ 2 (emphasis added). These leases also provided that either party had the right to terminate the lease on giving the other party six-months written notice. The majority inaccurately, but necessary to its result, characterizes Campbell's contracts with Dix and Kirby as a "tripartite arrangement" between Center State, Campbell, and Dix and Kirby. *Ante* at 5. As demonstrated, this inaccuracy is belied by the facts because Center State was *not* a party to the turkey contracts Campbell entered into with Dix and Kirby.

In order to ensure the lease payments, Center State, Dix, and Kirby executed "Letters of Agreement" in April of 1987 authorizing Campbell to make payments under its turkey contracts jointly to Center State, Dix, or Kirby. These "Letters of Agreement" provided:

[Tenant] hereby authorize[s] [Campbell] to make all payments due to [Dix and Kirby] in connection with the turkey production owned by Center State Farms ... payable jointly to [Tenant] and Center State Farms.

*Id.* at 625. As Center State had previously done, Dix and Kirby entered into the "Turkey Contracts" with Campbell. In the space marked "Grower" on these turkey contracts, "Center State" was added in addition to either Dix or Kirby's name. Conspicuously however, Scarborough never signed these turkey contracts, which is in marked contrast to his signing the turkey contracts prior to December 12, 1986, when Center State was a contracting party with Campbell. Rather, the turkey contracts entered into as of December 12, 1986, and thereafter, were signed by Campbell and Dix or Kirby.

### D.

In June of 1990, Campbell announced that its Sumter plant was for sale, and in November it announced that it would not place any more turkey poults in South Carolina. In January of 1991, Campbell sold the plant to Gold Kist, which did not process turkeys; consequently, Center State's turkey-operation facility ceased to exist. Center State asserted that it never received notice of the contract's termination from Campbell, but was apprised of termination through the local media.

Subsequently, Center State instituted these proceedings, bringing a claim for breach of contract against Campbell. Campbell answered the complaint and amended complaint [2] by generally denying the allegations and raising various affirmative defenses. Thereafter, Campbell unsuccessfully moved for summary judgment, and the case proceeded to trial. At the close of Center State's case-in-chief, Campbell moved unsuccessfully for judgment as a matter of law, *see* Fed.R.Civ.P. 50(a), contending that the breach of contract claim was barred by the statute of frauds, the merger doctrine, and

---

2. Of note, in its original complaint, Center State alleged that Campbell "would *permanently* provide poults, feed and medicine ... for as long as Center State performed satisfactorily...." (J.A. at 9, ¶ 4) (emphasis added). Center State omit-

ted the word "permanently" from its amended complaint, undoubtedly because perpetual contracts are ill-favored in South Carolina. *See Carolina Cable Network v. Alert Cable TV, Inc.,* 447 S.E.2d 199, 201 (S.C.1994).

the parol evidence rule. According to Campbell, the oral contract was not indefinite, but perpetual, and since such a contract cannot be performed within one year, it was barred by the statute of frauds. Alternatively, Campbell argued that any oral agreement was merged into the written turkey contracts, which contained express merger clauses. With respect to Center State's contention that not all terms were merged in the turkey contracts, such as purchasing propane for heating the turkey poults, Campbell asserted that these omitted terms were in other written contracts and likewise merged. Campbell thus contended that the parol evidence rule precluded any extrinsic evidence that Center State might have attempted to introduce. While the district court recognized that Campbell had made a "strong motion," the district court denied the motion without comment. *Id.* at 347. Again at the close of all the evidence and on the same bases, Campbell moved unsuccessfully for judgment as a matter of law, *see* Fed. R.Civ.P. 50(b), and the district court again denied the motion without comment. A jury returned a verdict in favor of Center State for $150,000. This appeal followed.

## II.

I conclude that the district court should have dismissed this suit because Center State lacked standing to prosecute this action for the simple reason that it had no contract with Campbell, nor was it a third-party beneficiary to the turkey contracts Campbell executed with Dix and Kirby. Indeed, Center State itself does not even raise the issue of being a third-party beneficiary. Not a party to any contract with Campbell on or after December 12, 1986, Center State lacks the requisite standing to sue.

On appeal, Campbell contends that Center State lacks standing to bring this suit because Campbell and Center State ceased having any contractual relationship by December 12, 1986. To support this contention, Campbell relies principally on the two letters from Scarborough confirming that he had terminated his contract with Campbell. Sub-

sequent to this date, Campbell contends, it contracted with Dix and Kirby,[3] not Center State. Center State responds to this contention by asserting that because Campbell failed to raise the issue of standing in the district court, Campbell waived raising this contention on appeal.

In *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court reaffirmed the necessity of standing to institute and maintain a suit and articulated the "irreducible constitutional minimum" that standing requires:

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical[.] Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at ——, 112 S.Ct. at 2136 (citations and internal quotation marks omitted) (alterations in original). Central to the standing analysis is the fact that a litigant "must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). The Supreme Court has adhered consistently to this principle. *See, e.g., United States Dep't of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 1431, 108 L.Ed.2d 701 (1990); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). Likewise, the circuits have ruled that "[r]ights personal to their holders may not be enforced by third parties." *Buckley v. Fitzsimmons,* 20 F.3d 789, 795 (7th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 740, 130 L.Ed.2d 642 (1995); *United States v. De*

---

**3.** Dix and Kirby are not parties to this suit, and at oral argument counsel for Campbell represent-

ed that Kirby unsuccessfully sued Campbell. No representations were made concerning Dix.

*Gross,* 960 F.2d 1433, 1437 (9th Cir.1992) ("Ordinarily, a party does not have standing to assert the legal rights or interests of another.") (*en banc*). Disagreement between entities, "however sharp and acrimonious it may be, is insufficient" to meet the standing requirement because one seeking standing must " 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct' of the other party." *Diamond v. Charles,* 476 U.S. 54, 62, 106 S.Ct. 1697, 1699, 90 L.Ed.2d 48 (1986) (quoting *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979)). Because objections to standing are jurisdictional in nature, they may be raised at any time, *see, e.g., Bender v. Williamsport Area Sch. Dist.,* 475 U.S. 534, 546–47, 106 S.Ct. 1326, 1333–34, 89 L.Ed.2d 501 (1986); *Bankston v. Burch,* 27 F.3d 164, 167 (5th Cir.1994), even if raised for the first time on appeal, *see, e.g., Animal Protection Inst. of Am. v. Hodel,* 860 F.2d 920, 923 (9th Cir.1988).

Applying these principles, I conclude that Center State lacks standing. First, *Center State* has not suffered injury in fact. If any persons have suffered injury in fact, Dix and Kirby have. Certainly, Center State has not suffered any injury that is "concrete and particularized" or "actual or imminent." Here, the letters from Scarborough declare unequivocally that relations between Center State and Campbell terminated on December 12, 1986. By these letters, Scarborough himself recognized that he no longer had any contractual relationship with Campbell. Rather, Campbell had a contractual relationship with Dix and Kirby, not Center State, as additionally evidenced by the fact that Dix and Kirby signed the turkey contracts with Campbell. The majority's mischaracterization to the contrary notwithstanding, Center State was not a party to the turkey contracts Campbell executed with Dix and Kirby: Center State never signed any of the turkey contracts on or after December 12, 1986, whereas prior to this date, Center State had signed the turkey contracts with Campbell.

Second, there is no causation between any alleged injury to Center State and Campbell's terminating its contracts with Dix and Kirby. Pursuant to Center State's lease agreements with Dix and Kirby, Center State disclaimed explicitly any obligations or responsibilities for raising any more turkey poults. Additionally, the lease agreements expressly provided that they created no partnership or joint venture between Center State and any other party. Rather than establishing causation, Center State took affirmative measures to distance itself from further relations with Campbell.

Third, an injury that does not exist cannot be redressed by a favorable decision. Having failed to satisfy all elements necessary to demonstrate standing, Center State lacks standing to prosecute this action. Accordingly, I conclude that the district court erred in entering judgment in favor of Center State. I would, therefore, vacate and remand with instructions to dismiss this suit.

The majority attempts to circumvent the force of Scarborough's letters by stating that the parties "settled" their differences as evidenced by the "Letters of Agreement," *ante* at 1033, but this is factually incorrect. The "Letters of Agreement" merely provided that Campbell was authorized to make payments jointly to Center State and Dix or Kirby. This was obviously done to ensure payment by Dix and Kirby to Center State of their lease obligations for the "turkey production" facility. While the "Letters of Agreement" recounted that Center State owned the *turkey production,* the turkey contracts specifically provided that Campbell owned the *turkeys.* Thus, this mischaracterization does not prove that a contract existed between Center State and Campbell on or after December 12, 1986. Rather, the reference to Center State's owning the "turkey production" is merely an acknowledgement that Center State did in fact own the physical plant and facilities in which the turkey poults were raised. Center State's continuing interest in Campbell's contracts with Dix and Kirby did not spring, therefore, from Center State's status as a contracting party; rather, Center State's interest was merely that of a landlord of the turkey-production facility, and as a landlord, Center State wanted to ensure that rent was paid, the turkey-production facility was physically maintained, and its investment was protected.

Even accepting the majority's conclusion that this single mischaracterization proved by a preponderance of the evidence that Center State had a contract with Campbell, it would collapse in the wake of overwhelming contrary evidence, namely Scarborough's letters, the turkey contracts that explicitly stated that the turkeys were the property of Campbell, and the parties' conduct. Additionally, regarding the testimony that this phrase in the "Letters of Agreement" referred to future flocks, there is, conspicuously, no ascription that the future flocks were delivered pursuant to contracts between Center State and Campbell, nor would there be since Campbell's contracts were with Dix and Kirby, not Center State. Moreover, even subscribing to the obscure contention that the parties settled their differences, there is no evidence that the contracts would continue on the same terms; indeed, the fact that there was settlement implies that there was renegotiation.

### III.

Alternatively, even assuming that a contract existed between Center State and Campbell on or after December 12, 1986, because such a contract was terminable at will, Campbell could, and did, terminate it. Campbell posits that this contract was indefinite and therefore terminable at will. Center State asserts that this contract was indefinite, but, because it was supported by independent consideration, it was not terminable at will. According to Center State, the independent consideration was the $150,000 used to render its chicken-houses suitable for raising turkey poults.

While the district court improperly instructed the jury that this was an employment contract, this contract is properly characterized as a service contract. *See Smith v. Central Soya of Athens, Inc.*, 604 F.Supp. 518, 523 (E.D.N.C.1985) (characterizing a chicken-raising operation similar to the operation in this appeal as a service contract). Service contracts of indefinite duration are terminable at will. *See, e.g., Elvgren Paint*

*Supply Co. v. Benjamin Moore & Co.*, 948 F.2d 1082, 1084 (8th Cir.1991) (holding that an oral distributorship agreement having no definite time period was terminable at will); *Wards Co. v. Lewis & Dobrow, Inc.*, 210 Va. 751, 173 S.E.2d 861, 865 (1970) (holding that a contract to provide advertising services providing for no definite duration and compensation being made on a monthly basis is terminable at will); *Carpenter Paper Co. v. Kellogg*, 114 Cal.App.2d 640, 251 P.2d 40, 47–48 (1952) (holding that if no period is fixed for the duration of a contract providing for personal services, the contract is terminable at will). Additionally, contracts predicated on "satisfactory performance," as in this appeal, are terminable at will. *See, e.g., Gordon v. Matthew Bender & Co.*, 562 F.Supp. 1286, 1291 (N.D.Ill.1983) (holding that a contract based on "satisfactory performance" is terminable at will); *Ladesic v. Servomation Corp.*, 140 Ill.App.3d 489, 95 Ill.Dec. 12, 488 N.E.2d 1355, 1358 (1986) (same). Here, the oral contract provided for no fixed duration, but was to continue for as long as there was satisfactory performance by the parties. Any contract between Center State and Campbell, therefore, was indefinite.

The courts hold uniformly that agreements of nonspecified duration are terminable at will by either party. *See, e.g., Jeppesen v. Rust*, 8 F.3d 1235, 1237 (7th Cir.1993) (applying Indiana law); *Rano v. Sipa Press, Inc.*, 987 F.2d 580, 585 (9th Cir.1993) (applying California law). South Carolina has long recognized that an indefinite contract is terminable at will:

> Where the parties to a contract express no period for its duration, and no definite time can be implied from the nature of the contract or from the circumstances surrounding them, it would be unreasonable to impute to the parties an intention to make a contract binding themselves perpetually. In such a case the courts hold with practical unanimity that the only reasonable intention that can be imputed to the parties is that the contract may be terminated by either, on giving reasonable notice of his intention to the other.

*Childs v. City of Columbia,* 87 S.C. 566, 70 S.E. 296, 298 (1911); *see also Carolina Cable Network v. Alert Cable TV, Inc.,* 447 S.E.2d 199, 201–02 (S.C.1994) (reaffirming *Childs*) (reversing a jury verdict for breach of contract and holding that a contract that originally provided for a one-year term and was unilaterally renewed annually for six years was terminable at will and the defendant's terminating the contract as being unprofitable on roughly four months notice was reasonable); *Orsini v. Trojan Steel Corp.,* 219 S.C. 272, 64 S.E.2d 878, 879 (1951) (holding that a contract to furnish employment permanently or for as long as the employee's performance remains satisfactory is indefinite and terminable at the will of either party). Accordingly, provided that a party provides reasonable notice of termination of an indefinite contract, it may be terminated by either party at any time. This rule, however, "does not apply where the employee has given a good consideration in addition to the services rendered." *Id.* The district court charged this exception to the *Childs* rule.

According to Center State, the rule of *Childs* does not apply here because it gave independent consideration—the $150,000. I disagree. Here, the $150,000 was part of the *original* consideration for the oral contract between Campbell and Center State in 1983, as negotiated by Rowland and Scarborough. This sum represents the money that Center State expended in converting its chickenhouses to make them suitable for raising turkey poults. Under the oral agreement, Center State was obligated to raise the turkey poults to mature birds and equipping itself was the consideration it supplied to fulfill its obligation; thus, being equipped to raise the turkey poults is not *independent* consideration; being equipped to perform is the original consideration bargained for in the oral contract in 1983. Center State seeks to have the $150,000 perform double duty. In *Orsini,* the Supreme Court of South Carolina held that an employee and his wife's giving up jobs, moving from Atlanta, Georgia, to Columbia, South Carolina, and sacrificing a home, school, church, friends,

and social affiliations was insufficient to supply the necessary independent consideration to take the case outside the ambit of *Childs. Id.,* 64 S.E.2d at 879. The instant appeal, which presents far less compelling circumstances than those of *Orsini,* falls within the purview of *Orsini.* Because this contract was indefinite and no independent consideration was supplied, it was terminable at will.

The issue now becomes whether the notice of termination was reasonable. In *Carolina Cable Network,* the court opined that principles governing distributorship agreements applied to the rules of construction governing the cable advertising contract. *Carolina Cable Network,* 447 S.E.2d at 202. According to the *Carolina Cable Network* court, reasonableness in terminating common law contracts requires that the termination not be "done arbitrarily, maliciously or in bad faith." *Id.* (citing Fourth Circuit cases applying South Carolina wrongful termination law).

Applying this test, Campbell gave reasonable notice, and thus the contract was properly terminated, thereby rendering Center State unable to succeed on a breach of contract claim. Here, Campbell announced in June of 1990 that the Sumter plant was for sale. In November of 1990, Campbell announced "that it would not place any more poults in the Sumter area," (Campbell's Brief at 11), and in January of 1991, Campbell sold the plant to Gold Kist, a manufacturer that did not require turkeys. Thus, there was a period of at least roughly six months between the announcement of the sale of the plant and the plant's actually being sold. Moreover, during this period, Campbell announced that its poult-related activities in South Carolina were being transferred to Arkansas. Campbell's notice of termination was not arbitrary, malicious, or made in bad faith.

According to Center State, because notice was provided through the local media, the notice of termination was unreasonable, even though Center State was fully aware that the Sumter plant was being closed by virtue of publication through the local media. Indeed,

the fact that Center State knew Campbell transferred its South Carolina poult-raising operations to Arkansas, where poult-raising was already under way, demonstrates that Center State was fully cognizant of the Sumter plant's closure. While personal notice of termination would have been better perhaps,[4] the public notice was sufficient. Of course, the reason personal notice was not provided was because Campbell had no contract with Center State. In the alternative, therefore, I would reverse and remand with instructions to enter judgment as a matter of law in favor of Campbell.

## IV.

The inescapable conclusion is that the district court erred in entering judgment on the jury verdict in favor of Center State. Center State lacked standing to sue for the simple reason that it had no contract upon which to sue—Center State itself terminated its contract with Campbell by December 12, 1986. Alternatively, even ignoring the standing conundrum as the majority does and assuming Center State and Campbell had a contract, the contract was for an indefinite duration, and therefore terminable at will. Because Campbell sufficiently provided reasonable notice of termination, the contract with Center State was terminated. Accordingly, I would vacate the order and remand with instructions to dismiss this suit; alternatively, I would reverse and remand with instructions to enter judgment in favor of Campbell.

---

4. At oral argument, counsel for Campbell represented that personal notice was effected, even though he could not cite to any specific reference in the record.