A04A2108, A04A2109. STOKER et al. v. BELLEMEADE, LLC et al.; and vice versa.

(615 SE2d 1)

ANDREWS, Presiding Judge.

These appeals arise from a suit brought by Jerry W. Stoker and The Stoker Group, Inc. (the Stokers) alleging that various entities and individuals breached written and oral agreements to develop real property located in Houston County. The suit named as defendants Westbury Properties, Inc.; Casa Cajco, Inc.; Benjh, LLC; Edward E. Faircloth; and James Pleydell-Bouverie (collectively referred to as the Westbury group), and included claims asserting breach of contract; unjust enrichment; breach of fiduciary duty; and defamation. The Westbury group answered and filed various counterclaims against the Stokers. The Stokers' suit also asserted claims against the following limited liability companies (LLCs) formed by the Stokers and various members of the Westbury group as part of the development process: Bellemeade, LLC; Jerusalem Church Road, LLC; Hatcher Road, LLC; Bousto, LLC; Westo, LLC; and Willis Creek, LLC (collectively referred to as the LLC group). Although the Stokers subsequently dismissed without prejudice all of their claims against the LLC group, the LLC group filed various counterclaims against the Stokers prior to the dismissal, which remained pending.[1] The present appeal in Case No. A04A2108 and the cross-appeal in Case No. A04A2109 are from the trial court's order on the parties' cross motions for summary judgment on various claims and counterclaims.

---

[1] The Stokers also brought and then dismissed without prejudice claims against Norman H. Volk; Rebecca S. Jones; and Tacabe, Inc.

We review the trial court's summary judgment rulings under the following standards: To prevail on a motion for summary judgment "the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law." *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). This burden may be carried by producing evidence which negates an essential element of the nonmoving party's claim, or by pointing out the absence of evidence supporting an essential element of that claim. Id. We review de novo the trial court's ruling on a motion for summary judgment, construing the evidence in the light most favorable to the nonmoving party. *Durben v. American Materials*, 232 Ga. App. 750 (503 SE2d 618) (1998).

*Case No. A04A2108*

The Stokers appeal from the trial court's order granting summary judgment against them on various claims brought against members of the Westbury group.

1. We find no error in the trial court's grant of summary judgment against the Stokers on their unjust enrichment claim against Casa Cajco, Inc. set forth in Count 3 of their restated complaint.[2] Members of the Westbury group, including Casa Cajco, were owners, managers, and developers of a large tract of real property located in Houston County. The Stokers, who were in the business of developing real property, entered into various joint venture agreements with members of the Westbury group pursuant to which the parties formed LLCs to develop various parcels of the tract for residential purposes. The Stokers claim that, to induce them to enter into the LLC agreements and jointly develop the residential parcels, members of the Westbury group orally agreed to allow the Stokers to participate in the future development of all the residential and commercial development in the larger tract.

The Stokers concede they have no enforceable contract with respect to promised participation in the future development of the portion of the tract designated for commercial development. They contend, however, that when the Westbury group refused to recognize they had any such contractual right, this had the effect of unjustly enriching Casa Cajco, the owner of the commercially designated property. Under the Stokers' theory, development of the residential

---

[2] Although the Stokers' restated complaint shows this claim was brought against the entire Westbury group, the Stokers conceded in response to the motion for summary judgment and on appeal that recovery of damages on this claim was sought solely against Casa Cajco, Inc.

parcels increased the market value of the adjacent commercially designated property and conferred a benefit which unjustly enriched the owner, Casa Cajco. Accordingly, the Stokers claim they are entitled to restitution from Casa Cajco for the portion of the increased commercial property value attributable to their participation in the development of the residential parcels.

> Unjust enrichment applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for.

(Citation and punctuation omitted.) *Engram v. Engram*, 265 Ga. 804, 807 (463 SE2d 12) (1995). Under the unjust enrichment doctrine, a party is not allowed to enrich itself inequitably at another's expense. *White v. Arthur Enterprises*, 219 Ga. App. 124 (464 SE2d 225) (1995).

The Stokers claim Casa Cajco and others induced them to jointly develop the residential parcels by the oral promise of future participation in adjacent commercial development, but they do not contend they were not fairly compensated for the development work they did on the residential parcels under the written LLC agreements. Although the Stokers conferred a benefit on Casa Cajco to the extent their work on the residential developments increased the market value of the commercial property, they were compensated for the work done, and the benefit conferred by the work did not unjustly enrich Casa Cajco at the Stokers' expense. See *Rodriguez v. Vision Correction Group*, 260 Ga. App. 478, 479-480 (580 SE2d 266) (2003); *Scott v. Mamari Corp.*, 242 Ga. App. 455, 458-459 (530 SE2d 208) (2000).

> Even where a person has received a benefit from another, he is liable to pay therefor only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it. The mere fact that a person benefits another is not of itself sufficient to require the other to make restitution therefor. Thus, one who improves his own land ordinarily benefits his neighbors to some extent, and one who makes a gift or voluntarily pays money which he knows he does not owe confers a benefit; in neither case is he entitled to restitution.

Restatement of Restitution, § 1, Unjust Enrichment, cmt. c (1937); accord Restatement (Third) of Restitution and Unjust Enrichment,

§ 2, cmt. e (Discussion Draft, 2000). Under the circumstances, there is no basis to conclude that it was unjust for Casa Cajco to retain the benefit of the increased market value of the commercial property. Although the trial court may have granted summary judgment in favor of Casa Cajco and the other Westbury group members on this issue for other reasons, a decision right for any reason will be affirmed. *Rodriguez*, 260 Ga. App. at 480; *Lau's Corp.*, supra.

2. The Stokers alleged in Count 1 of their restated complaint that, after they entered into the LLC agreements to jointly develop various residential parcels in the larger tract, the Westbury group breached a separate oral agreement to allow them to jointly develop the other residential property in the tract. They contend the trial court erred by granting summary judgment in favor of the Westbury group on this claim.

In the various residential developments in which the Stokers participated, the Stokers and members of the Westbury group entered into joint venture agreements pursuant to which they created a number of LLCs and entered into LLC operating agreements. The written LLC agreements were created for the purpose of developing portions of the larger tract, but none of the agreements contained a description of the land to be acquired and developed. Nevertheless, it is undisputed that, pursuant to the LLC agreements, the Stokers and members of the Westbury group purchased, possessed, and improved identifiable parcels. Accordingly, at least as to these parcels, the purchase, possession and development of the land supplied the equivalent of a written description and satisfied the requirement of the Statute of Frauds that every essential element of "[a]ny contract for sale of lands, or any interest in, or concerning lands" must be in writing to be enforceable. OCGA § 13-5-30 (4); see *Smith v. Cox*, 247 Ga. 563 (277 SE2d 512) (1981); OCGA §§ 13-5-31; 23-2-131 (b).

The Stokers contend that, when members of the Westbury group separately developed other parcels in the larger tract without including them in the developments, this breached an oral agreement to allow them to jointly purchase and develop all the residential land in the larger tract on the same terms that were set forth in the written LLC agreements. However, as the Westbury group asserted in support of their motion for summary judgment, any such oral agreement necessarily included the Stokers' acquisition of an interest in the land to be developed and required a writing to be enforceable under the Statute of Frauds. *East Piedmont 120 Assoc. v. Sheppard*, 209 Ga. App. 664, 665 (434 SE2d 101) (1993); OCGA § 13-5-30 (4). The Stokers acknowledge this but contend there was a part performance of the oral agreement which satisfied the Statute of Frauds.

The writing requirement of the Statute of Frauds does not apply "[w]here there has been such part performance of the contract as

would render it a fraud of the party refusing to comply if the court did not compel a performance." OCGA § 13-5-31 (3). The Stokers contend that the written LLC agreements pursuant to which they and members of the Westbury group jointly acquired and developed portions of the larger residential tract show sufficient part performance of an oral contract to jointly develop the larger tract. See OCGA §§ 13-5-31 (3); 23-2-131 (b). However, in order to remove the alleged oral contract from the Statute of Frauds, "the part performance shown must be consistent with the presence of a contract and inconsistent with the lack of a contract." (Citation and punctuation omitted.) *Studdard v. George D. Warthen Bank*, 207 Ga. App. 80 (427 SE2d 58) (1993); *Rose v. Cain*, 247 Ga. App. 481, 484-485 (544 SE2d 453) (2001). The Stokers' joint development of some parcels pursuant to the written LLC agreements may be consistent with an oral agreement to develop the larger tract, but there is nothing in the LLC agreements which is inconsistent with the lack of such an oral agreement. *Studdard*, 207 Ga. App. at 80-81. The written LLC agreements in which the Stokers participated referred only to the development of the specific parcels acquired and developed under those agreements and did not tend to prove that the Westbury group agreed to the oral contract the Stokers seek to enforce. Moreover, it is undisputed that the Stokers were compensated for the development work they did under the LLC agreements, so this result works no fraud within the meaning of OCGA § 13-5-31 (3). Accordingly, we find no evidence of part performance sufficient to remove the alleged oral agreement from the Statute of Frauds. *Engram*, 265 Ga. at 805. The Westbury group was entitled to summary judgment in their favor on this claim because the alleged oral agreement was unenforceable under the Statute of Frauds. OCGA § 13-5-30. Although the trial court granted summary judgment to the Westbury group on this claim for other reasons, we affirm under the right for any reason rule. *Rodriguez*, 260 Ga. App. at 480; *Lau's Corp.*, supra.

3. The Stokers also contend the trial court erred by granting summary judgment against them on Count 6 of their restated complaint asserting a direct claim (as members of the LLCs) that Westbury Properties, Benjh, and Pleydell-Bouverie breached fiduciary duties owed as members of the LLCs. Before reaching the merits of this claim, we must first determine whether the Stokers had standing to assert this claim in their own behalf in a direct action against other members of the LLCs instead of derivatively on behalf of the LLCs. Because the LLCs at issue are all closely held entities with some corporate characteristics, we address this issue by looking to the analogous situation presented under similar circumstances in the context of closely held corporations.

The general rule in the corporate context is that a shareholder suit seeking to recover damages for breach of fiduciary duties owed to the corporation must be brought as a derivative suit on behalf of the corporation. *Phoenix Airline Svcs. v. Metro Airlines*, 260 Ga. 584, 585 (397 SE2d 699) (1990). A shareholder has standing to bring a direct action, seeking recovery on behalf of the shareholder individually, only if the suit alleges a special injury separate and distinct from that suffered by other shareholders, or alleges a wrong involving a shareholder contractual right existing apart from any right of the corporation. *Grace Bros., Ltd. v. Farley Indus.*, 264 Ga. 817, 818-820 (450 SE2d 814) (1994). Applying the general corporate rule in the present case, the Stoker LLC members did not allege that they suffered a special injury distinct from that suffered by other LLC members, nor did they allege a wrong involving a member contractual right apart from a right of the LLC. Accordingly, they did not show standing to assert a direct action, and the general rule requiring a derivative action on behalf of the LLC would ordinarily apply.

However, even where the allegations of the complaint do not show standing to assert a direct action, a direct action may nevertheless be proper in the context of a closely held corporation where the circumstances show that the reasons for the general rule requiring a derivative suit do not apply. *Thomas v. Dickson*, 250 Ga. 772, 774-775 (301 SE2d 49) (1983); *Grace Bros.*, 264 Ga. at 819. As set forth in *Thomas*, supra, the reasons for requiring derivative suits in the ordinary corporate context are (1) to prevent multiple suits by shareholders; (2) to protect corporate creditors by ensuring that the recovery goes to the corporation; (3) to protect the interest of all the shareholders by ensuring that the recovery goes to the corporation, rather than allowing recovery by one or a few shareholders to the prejudice of others; and (4) to adequately compensate injured shareholders by increasing their share values. Id. at 774. Because none of these reasons applied in the context of the closely held corporation in *Thomas*, supra, the court found that a direct action by the shareholder for misappropriation of corporate funds was proper. Id. at 774-775. On similar grounds, we find no reason to require the Stokers to derivatively assert the breach of fiduciary duty claims in the context of the closely held LLCs in the present case.

With respect to the two-member LLCs at issue, the Stoker member of the LLC asserted that the other LLC member breached fiduciary duties by (1) usurping LLC opportunities by engaging in competing land developments; (2) converting LLC assets by improperly transferring funds held by the LLC; and (3) improperly excluding the Stoker member from LLC affairs. Since both members of the LLC in each claim are parties to the suit, we find no danger of multiple suits and no concern that a recovery would prejudice the rights of the

other member. Moreover, a direct suit with all the members joined may prevent a defendant member from inappropriately sharing in the recovery, while providing an appropriate recovery to a plaintiff member who would gain no benefit from a derivative recovery on behalf of the LLC given the lack of a ready market for closely held LLC interests. Finally, as to protection of LLC creditors, the record does not reflect any evidence of existing creditors, and none of the members have offered evidence of existing creditors. Accordingly, we find the trial court properly recognized that the Stokers had standing to assert these claims in a direct action. *Thomas*, 250 Ga. at 774-775; LLC Member and Limited Partner Breach of Fiduciary Duty Claims: Direct or Derivative Actions? 7 J. Small and Emerging Bus. L. 19, 52-61 (2003).

In support of their argument that the Stokers were required to assert these claims derivatively, the Westbury group defendants point out that in *Jamal v. Pirani*, 227 Ga. App. 713, 714 (490 SE2d 140) (1997) and in *Carter v. Murphey*, 256 Ga. App. 150, 152 (567 SE2d 326) (2002), which followed *Jamal*, this Court stated that *Grace Bros.*, 264 Ga. at 819, limited the direct action exception in the context of close corporations to situations where the evidence shows the corporation was a "statutory close corporation" created pursuant to OCGA § 14-2-901 et seq. They argue that, because the LLCs at issue are not statutory close corporations, nor is there any analogous statutory scheme for closely held LLCs, there is no basis for allowing these claims to be brought directly rather than derivatively. This Court has not adhered to the statement first made in *Jamal*, supra, and followed in *Carter*, supra, that the direct action exception applies only where evidence shows a close corporation created pursuant to OCGA § 14-2-901 et seq. We recognized that direct rather than derivative actions were proper in close corporation contexts in *Dunaway v. Parker*, 215 Ga. App. 841, 845-846 (453 SE2d 43) (1994); *Parks v. Multimedia Technologies*, 239 Ga. App. 282, 286-288 (520 SE2d 517) (1999); and *Mon Ami Intl. v. Gale*, 264 Ga. App. 739, 743-744 (592 SE2d 83) (2003), despite no evidence that the corporations were created pursuant to OCGA § 14-2-901 et seq. We hold in accordance with these cases that a direct action is proper in the context of a close corporation where the exceptional circumstances found in *Thomas*, 250 Ga. 772, are present, even though the corporation was not created pursuant to OCGA § 14-2-901 et seq. *Grace Bros.*, 264 Ga. 817, does not hold otherwise. *Grace Bros.* cited with approval to the exceptional circumstances involved with the close corporation in *Thomas*, supra (which was not a statutory close corporation) and held that "outside the context of a close corporation, a shareholder must be injured in a way which is different from the other shareholders or independently of the corporation to have

standing to assert a direct action." (Footnote omitted.) *Grace Bros.*, 264 Ga. at 819. The phrase "close corporation" in the above quote was followed by footnote 6 in which the court stated that a shareholder in a statutory close corporation created pursuant to OCGA § 14-2-901 et seq. has a statutory right to bring a direct action under circumstances set forth in OCGA § 14-2-940 (a) (1). This merely recognized that the statutory rights to a direct action are in addition to direct actions found proper under the close corporation circumstances set forth in *Thomas*, supra. To the extent the decisions in *Jamal*, 227 Ga. App. 713, and *Carter*, 256 Ga. App. 150, are inconsistent with this reading of *Grace Bros.*, they are overruled. We find no reason not to allow LLC members to bring direct actions in analogous situations. Accordingly, we now address the merits of the Stokers' direct claims.

The Stokers claim with respect to each LLC at issue that the other member of the LLC (Westbury Properties, Benjh, or Pleydell-Bouverie) violated fiduciary duties imposed on them as members when they usurped LLC opportunities and improperly competed with the LLC by participating in developments of other parcels contained in the larger tract owned or managed by members of the Westbury group. Even assuming these members participated in competing developments, there was no basis for finding that they breached fiduciary duties owed as members of the LLCs.

Section 14-11-305 of the Georgia Limited Liability Company Act (the LLC Act) provides in relevant part that:

(1) A member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. A member or manager is not liable to the limited liability company, its members, or its managers for any action taken in managing the business or affairs of the limited liability company if he or she performs the duties of his or her office in compliance with this Code section. Except as otherwise provided in the articles of organization or a written operating agreement, a person who is a member of a limited liability company in which management is vested in one or more managers, and who is not a manager, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member; . . .

(4) To the extent that, pursuant to paragraph (1) of this Code section or otherwise at law or in equity, a member or

manager has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager:

(A) The member's or manager's duties and liabilities may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement; provided, however, that no such provision shall eliminate or limit the liability of a member or manager:

(i) For intentional misconduct or a knowing violation of law; or

(ii) For any transaction for which the person received a personal benefit in violation or breach of any provision of a written operating agreement; and

(B) The member or manager shall have no liability to the limited liability company or to any other member or manager for his or her good faith reliance on the provisions of a written operating agreement, including, without limitation, provisions thereof that relate to the scope of duties (including fiduciary duties) of members and managers.

Although OCGA § 14-11-305 describes various duties and liabilities, including fiduciary duties, it also makes clear that the duties and liabilities "may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement" subject to the restrictions set forth. The contractual flexibility provided in this section is consistent with OCGA § 14-11-1107 (b) of the LLC Act which provides that: "It is the policy of this state with respect to limited liability companies to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements."

The LLC operating agreements at issue (all containing identical language) provided that the LLCs were managed by the members and also contained the following provisions:

[N]othing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the [LLC] or to any other Member with respect to that business or activity even if the business or activity competes with the [LLC's] business. The organization of the [LLC] shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or

participate in such other interests or activities of any other Member or the Member's Affiliates.

These provisions make clear that, despite any duties described in the LLC Act that might have otherwise restrained a member from competing with the LLC, the members exercised the freedom granted by the LLC Act to restrict or eliminate those duties by contract and to engage in activities which competed with the LLC's business. OCGA §§ 14-11-305; 14-11-1107 (b); accord *McConnell v. Hunt Sports Enterprises*, 725 NE2d 1193, 1206-1207 (Ohio App.3d 1999) (LLC operating agreement allowing members to compete with LLC business); *Walker v. Resource Dev. Co.*, 791 A2d 799, 813-814 (Del. Ch. 2000) (recognizing broad freedom to contract in LLC operating agreements). Accordingly, we find the trial court properly granted summary judgment in favor of Westbury Properties, Benjh, and Pleydell-Bouverie on this claim. *Lau's Corp.*, supra.

The Stokers also claimed that Westbury Properties, Benjh, and Pleydell-Bouverie breached fiduciary duties owed as members of the LLCs by converting LLC assets. In support of this contention, the Stokers point to evidence that money was loaned to one of the LLCs at issue for development expenses on a parcel of land that was ultimately never acquired and developed by the LLC. Because the LLC did not acquire and develop the parcel, funds held by the LLC related to the loan were transferred by the LLC to the lender in satisfaction of the loan and any claims by the lender. The Stoker member does not claim the LLC was entitled to keep the funds and not acquire and develop the parcel. Rather, the gravamen of the claim is that the funds were improperly transferred under the operating agreement without the consent of the Stoker LLC member. Even if this consent were needed, the only apparent damage asserted is that the LLC was prevented from developing the parcel it never acquired. Because the Stoker member failed to produce evidence of a conversion or damage, the trial court properly granted summary judgment against the claim. *Lau's Corp.*, supra.

Finally, the Stoker LLC members claim the trial court erred by granting summary judgment against them on their claim that Westbury Properties, Benjh, and Pleydell-Bouverie breached fiduciary duties by excluding them from LLC affairs. Although the record shows the trial court orally pronounced that it intended to grant summary judgment and dismiss this claim, the written summary judgment order does not address this issue. "A trial court's oral pronouncement is not a judgment until it is put in writing and entered as the judgment." *In the Interest of L. H.*, 242 Ga. App. 659, 660 (530 SE2d 753) (2000). Accordingly, this claim presents nothing for appellate review.

*Case No. A04A2109*

In the cross-appeal, members of the Westbury group appeal from various rulings by the trial court denying aspects of their motion for summary judgment, and the LLC group appeals from the grant of summary judgment against their breach of fiduciary duty claims.

4. Count 4 of the restated complaint asserted a defamation claim by Jerry Stoker against Edward Faircloth alleging that Faircloth made slanderous statements about Stoker to Charles Gross, a builder interested in buying residential lots in the developments. Faircloth contends the trial court erred by denying his motion for summary judgment on this claim.

After the present litigation commenced, Faircloth, who worked for Westbury Properties, contacted Gross about the possibility of buying lots in one of the developments. Gross was a longtime friend of Stoker and had previously purchased lots in various developments through his contacts with Stoker. There was evidence that Stoker was engaged in developing and selling lots in the joint ventures with members of the Westbury group and through his own developments. Gross told Faircloth that he always bought his lots through Stoker and that any additional lots he purchased would be through Stoker. According to Gross, Faircloth gave him the following response: "Jerry [Stoker] isn't going to be selling lots here in Warner Robins much longer. He probably is going back to Valdosta, so if you want to buy these lots, you need to sign a contract with me."

Stoker contends this statement was slander per se because it made the false charge that Stoker's development business in the area had failed or was closing down, which was calculated to injure his continuing business in the area. OCGA § 51-5-4 (a) (3). To determine whether a statement is slander per se, courts look to the plain import of the words spoken and will not enlarge their meaning by innuendo. *Palombi v. Frito-Lay*, 241 Ga. App. 154, 156 (526 SE2d 375) (1999). "The pivotal questions are whether the statements can reasonably be interpreted as stating or implying defamatory facts about plaintiff and, if so, whether the defamatory assertions are capable of being proved false." (Punctuation omitted.) *Webster v. Wilkins*, 217 Ga. App. 194, 195 (456 SE2d 699) (1995). Under this standard, we find the statements at issue could reasonably be interpreted as having the purpose of injuring Stoker's business by stating or implying that Stoker was going out of the development business in which he was still engaged and leaving the area, and that these assertions are capable of being proved false. This was sufficient to support a claim for slander per se under OCGA § 51-5-4 (a) (3), so the trial court properly denied Faircloth's motion for summary judgment on this claim. *Lau's Corp.*, supra.

5. The Stokers, who were members of LLCs which acquired and developed various residential parcels, alleged that the LLCs suffered damage because of excessive development costs resulting in reduced profit from the sale of developed lots. In Counts 5 and 6 of their restated complaint, the Stokers asserted direct actions against members of the Westbury group (Benjh, Pleydell-Bouverie, and Westbury Properties), who were the other members of the LLCs. These actions included claims that the excessive costs occurred because the other LLC members breached contractual and fiduciary duties owed under the LLC joint venture and operating agreements. The Westbury group LLC members claim the trial court erred by denying their motion for summary judgment on these claims.

For the reasons set forth in Division 3, supra, we find that the trial court correctly rejected the argument made by the Westbury group defendants that these claims were improperly asserted by the Stokers in direct actions and could only be asserted derivatively on behalf of the LLCs.

Nevertheless, we find a lack of evidence in the record to support the breach of contract and fiduciary duty claims and conclude that the trial court erred in denying summary judgment to the Westbury group defendants on these claims. The LLC operating agreements at issue provided that:

> A Member shall not be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the [LLC] for any act performed by the Member with respect to [LLC] matters, except for fraud, gross negligence, or an intentional breach of this Agreement.

The LLC joint venture agreements further provided that the Westbury group LLC member had the primary responsibility to supervise the development construction. As set forth in Division 3, supra, subject to the restrictions set forth in OCGA § 14-11-305 (4) (A), the LLC members were free to adopt contractual provisions to control, expand, restrict, or eliminate duties otherwise set forth under the LLC Act.

Citing these contractual provisions, the Stokers claim that the LLCs incurred excessive development costs because the Westbury group LLC members were grossly negligent in failing to monitor the costs of development construction. In support of this claim, the Stokers produced an affidavit from a contractor who reviewed the civil engineering plans on three of the parcels developed by the LLCs and provided an estimate of the costs of doing the development work. The contractor stated that he made the estimate "by determining the quantity of the materials needed, the expected labor costs . . . [and by

adding] overhead of three [to] five percent . . . and profit of six percent." He included certain work in the estimate and excluded other work, stating that "[t]his is the same technique employed by me when preparing bids to perform such work." The Stokers argue that, because the actual development cost incurred by the LLCs on the three developments was about 25 percent higher than the estimates in the affidavit, this was evidence that: (1) the development cost incurred by the LLCs was excessive, and (2) the excessive cost resulted from gross negligence by Westbury group LLC members.

In the case of the LLCs at issue, the Stoker LLC member and the Westbury group LLC member formed a two-member LLC, which required the vote of both members to conduct the business affairs of the LLC. The Stokers do not fault the other LLC member for the decision to hire the contractor which did the development work. Nor do they fault the other LLC member for the terms of the development contract between the contractor and the LLC. The contract entered into by the LLC for the developments at issue was not for a fixed sum, but provided for payment of actual development costs plus a ten percent profit.

First, the cost figure in the contractor's affidavit submitted by the Stokers, which was twenty-five percent under the development costs actually incurred by the LLCs, was based on a fixed cost estimate, but the contract between the LLC and the contractor was for payment of actual costs plus a ten percent profit. The Stokers have failed to show that the fixed cost estimate in the affidavit using the techniques and assumptions employed therein can be fairly compared to the costs paid under the cost-plus contracts actually used by the LLCs. Moreover, the Stokers were equally responsible for LLC management decisions and do not assign any blame for the fact that the LLC entered into the cost-plus contract rather than negotiating a fixed price. Second, even if we assume there was some evidence that development costs were higher than those incurred by other developers under similar circumstances, we find nothing in the record which could support a determination that the higher costs occurred because a Westbury group LLC member breached any provision of the LLC agreements or was grossly negligent. Accordingly, the trial court erred by denying the motion for summary judgment brought by Westbury Properties, Benjh, and Pleydell-Bouverie on these claims. *Lau's Corp.*, supra.

6. In response to the Stokers' initial claims against the LLC group (which the Stokers later dismissed), the LLC group filed various counterclaims against the Stokers, including counterclaims that the Stokers, as members of the LLCs, breached fiduciary duties owed to the LLCs by refusing to sign contracts allowing the LLCs to

sell developed lots. The LLC group claims that the trial court erred by granting summary judgment on these claims in favor of the Stokers.

The counterclaims were brought in the name of the LLCs, all of which were comprised of two members — the Stoker group member and the member associated with the Westbury group. With respect to each LLC, the joint venture agreement stated that each member owned a 50 percent interest in the LLC, and that management of the LLC was "by the members on the basis of majority rule of 51% of the membership." The LLC operating agreement similarly provided that each member had a "right to participate in the management of and vote on matters coming before the [LLC]," and that the business of the LLC "shall be managed by a majority of the members." It follows that each member of the LLC had equal authority and that the vote of both members was required to authorize management decisions.

It is undisputed that the Stoker member of each LLC did not vote to authorize the LLC to counterclaim against the Stoker member, so the decision to assert a counterclaim in the name of each LLC was supported by less than a majority of the members of the LLC. Under these circumstances, we agree with the trial court that the counter-claims were improperly brought in violation of the LLC joint venture and operating agreements. Once again, we find support for this conclusion in similar circumstances applied to corporations.

In *Glisson Coker, Inc. v. Coker*, 260 Ga. App. 270, 271-273 (581 SE2d 303) (2003), we found that, where a corporation is comprised of two stockholders, each with an equal fifty percent share of the stock and each with an equal degree of control over corporate affairs, one stockholder cannot authorize an action in the name of the corporation against the other stockholder. As set forth in *Glisson*, the proper course under these circumstances is to assert a derivative action in the name of the complaining stockholder on behalf of the corporation, or where the special circumstances in *Thomas*, 250 Ga. 772, permit, bring a direct action in the name of the complaining stockholder seeking individual recovery. *Glisson*, 260 Ga. App. at 272. We apply the same rule to the LLCs under the circumstances presented in this case. Because the counterclaims were not authorized under the LLC joint venture and operating agreements by the required majority of the members, they were improperly brought in the name of the LLCs and were subject to dismissal without prejudice to assertion of derivative or direct claims.[3] Accordingly, we vacate the trial court's grant of summary judgment on these counterclaims and remand the case with directions that the counterclaims be dismissed without prejudice.

---

[3] See OCGA § 14-11-801 et seq. (derivative actions under the LLC Act).

*Judgment affirmed in Case No. A04A2108. Ruffin, C. J., Johnson, P. J., Blackburn, P. J., Smith, P. J., Miller, Ellington, Phipps, Mikell and Bernes, JJ., concur. Barnes and Adams, JJ., concur in part and dissent in part. Judgment affirmed in part, reversed in part and vacated in part, and case remanded with directions in Case No. A04A2109. Ruffin, C. J., Johnson, P. J., Blackburn, P. J., Smith, P. J., Barnes, Miller, Ellington, Phipps, Mikell, Adams and Bernes, JJ., concur.*

ADAMS, Judge, concurring in part and dissenting in part.

In Case No. A04A2108, I concur with the result in Division 1 of the majority opinion but disagree with the reasoning, and I respectfully dissent to Divisions 2 and 3. I fully concur in Case No. A04A2109.

1. In Count 3 of their restated complaint, Stoker and his company claim that Casa Cajco, Inc., the primary owner of the real estate intended for commercial development, was unjustly enriched when Westbury Properties refused to allow Stoker to participate in the development of the commercial property. One intended result of developing the residential property was to enhance the value of the commercial property; and, according to Stoker, Westbury promised that Stoker would participate in the future development of the commercial property if he agreed to enter into a series of joint ventures with Westbury to develop the residential property. Stoker argues that because Westbury reneged on that agreement, Casa, an entity related by ownership to — and largely controlled by — Westbury,[4] was unjustly enriched to the extent that Stoker's contribution to the development of the residential property enhanced the value of Casa's property, a fact about which there is no dispute.[5]

The majority opinion concludes that the Stokers have presented no basis to conclude that it would be unjust for Casa to retain the benefit of the appreciation in the value of the land. The majority bases its conclusion on one factual statement and citations to two cases and the Restatement of Restitution. None of these grounds is proper authority for denial of the Stokers' claim for unjust enrichment, and

---

[4] Casa is a corporation owned by Susan P. Cochran and a related trust and principally controlled by Cochran. Cochran is also a co-owner of Westbury Properties, along with James Pleydell-Bouverie ("Bouverie"), Cochran's cousin, and Norman Volk. Volk is also the executive officer of Casa and an acknowledged agent of Cochran, and Cochran has given him control of development of Casa's land. Bouverie is the president of Westbury Properties, and Edward Faircloth is the vice president. Westbury Properties manages Casa's property. Volk and Bouverie are the controlling owners of Benjh, LLC, the entity that entered into a series of joint ventures with Stoker to develop the residential property.

[5] Stoker acknowledges that the oral agreement was not enforceable because the parties failed to agree to several details about Stoker's participation in the commercial development; accordingly, Stoker dropped his related claims of breach of contract and fraud.

one of the cases is improperly cited for a general proposition of law. Nevertheless, the Stokers' claim fails for different reasons.

First, the majority states that the Stokers "do not contend they were not fairly compensated" for their participation in the development of the residential property, and therefore "the benefit conferred by the work did not unjustly enrich Casa Cajco at the Stokers' expense." But in many cases, "[t]he measure of damages under quantum meruit or unjust enrichment is based upon the benefit conferred upon the defendant and not upon the cost to render the service or cost of the goods." *Zampatti v. Tradebank Intl. Franchising Corp.*, 235 Ga. App. 333, 340 (5) (508 SE2d 750) (1998), and cases cited therein. A comment to the Restatement of Restitution (First) regarding circumstances where benefit and loss do not coincide is instructive:

> In other situations, a benefit has been received by the defendant but the plaintiff has not suffered a corresponding loss or, in some cases, any loss, but nevertheless the enrichment of the defendant would be unjust. In such cases, the defendant may be under a duty to give to the plaintiff the amount by which he has been enriched.

Restatement of Restitution, § 1, Unjust Enrichment, cmt. e (1937). Thus, the simple fact that Stoker may have been reasonably compensated for his work on the residential property is not controlling on the question of whether Casa was unjustly enriched.

Second, the majority relies on the obvious principle that no person is unjustly enriched as a result of services provided by the claimant where the claimant was hired and fully compensated for precisely the work performed. This is the point of Comment c of the Restatement, quoted by the majority, in which the authors explain that something more is needed for enrichment to be considered unjust.[6] (*Scott v. Mamari Corp.*, 242 Ga. App. 455, 458 (2) (530 SE2d 208) (2000), makes essentially the same point, and is therefore

---

[6] Both comments "c" and "e" quoted above are comments to Topic 1 of the Restatement, an introductory topic describing the general principles underlying most claims of restitution, unjust enrichment being the primary one, but the rules for determining the circumstances under which one is allowed to recover fill up the remainder of the treatise:

> The rules stated in the Restatement of this Subject depend for their validity upon certain basic assumptions in regard to what is required by justice in the various situations. In this Topic, these are stated in the form of principles. They cannot be stated as rules since either they are too indefinite to be of value in a specific case or, for historical or other reasons, they are not universally applied. They are distinguished from rules in that they are intended only as general guides for the

distinguishable.) In this case, Stoker alleges more. He contends the unjust element is that Westbury and related parties, possibly including Casa, breached their oral promise to let him participate on a 50/50 basis in the development of the commercial property and that he would not have helped develop the residential property (which enhanced Casa's property value) without that promise.

Third, the case of *Rodriguez v. Vision Correction Group*, 260 Ga. App. 478 (580 SE2d 266) (2003), upon which the majority relies, should not be cited for a general proposition of law. The majority cited it for the proposition that because Stoker was reasonably compensated for the work actually performed, any benefit conferred on another party as a result of that work is not unjust. As shown above, there are situations where a claim of unjust enrichment is allowed even though the claimant has suffered no loss, and the measure of damages can be the benefit conferred upon the defendant. The ultimate question is not necessarily whether the claimant has been reasonably compensated but whether someone else has been unjustly enriched.

Nevertheless, Stoker's claim for unjust enrichment fails on the facts for the following reasons: (1) all parties intended that Casa would receive the benefit of the appreciation in the value of its land, (2) someone besides Stoker could have developed the residential property, (3) the alleged agreement or agreements about commercial property did not become finalized, if at all, until after the residential development had begun, and (4) the commercial property has not yet been developed. Accordingly, no person or party has been unjustly enriched.

With regard to development of the residential property, Westbury and Casa had agreed to a price at which all future residential parcels would be sold to the Stoker/Benjh, LLCs, and therefore Stoker may have had an interest in the future appreciation of that property. But with regard to the commercial property, Stoker admits both that there was no such agreement and that when Casa ultimately sold the property to developers all parties understood that it would get "market value." Thus, all parties intended that Casa would be the party "enriched" by the enhanced value resulting from development of the residential property. Second, there is no evidence that the

---

conduct of the courts and are not intended to express that universality of application to particular cases which is characteristic of the statements made in subsequent chapters.

Restatement of Restitution, Ch. 1, Topic 1-Underlying Principles. Thus, the specific rules for determining when, under the Restatement, restitution is allowed are provided in the subsequent chapters. Id.

commercial property appreciated because Stoker was the residential developer, rather than that it appreciated because the residential property was developed, regardless of who did it. Thus, Stoker had no reason to directly benefit by the appreciation of the commercial property. Third, by his own testimony, the alleged oral agreement that he could participate in the development of the commercial property was being discussed for some period of time well beyond the commencement of the residential development. In fact, at a point in time when the parties were "running out of the residential," Stoker was still discussing participation with the appellees in the commercial development. And, at the earliest discussion of the topic, Stoker testified that the appellees said that they did not have a problem with Stoker participating in the commercial property but that it had to be discussed: "it was always everything had to be discussed with [Bouverie] or [Volk]." Thus, the suggestion that Stoker refused to participate in the residential development on a 50/50 basis with the appellees without a promise about the commercial property has been undermined by Stoker's own testimony. Finally, the commercial property has yet to be developed, and no party has been enriched by that effort. So, although Stoker may have indirectly conferred an advantage upon Casa, he has not demonstrated that Casa's retention of the benefit without compensating Stoker is unjustified. In summary there is no evidence by which one could conclude that Casa was *unjustly* enriched as a result of the alleged broken promise. Summary judgment is proper when there is an absence of evidence to support a claim of unjust enrichment. See, e.g., *Engram v. Engram*, 265 Ga. 804, 807 (463 SE2d 12) (1995).

For the above reasons, I agree with the result in Division 1 of the majority opinion but not the reasoning.

2. In Count 1 of the restated complaint, Stoker alleges that the defendants breached two separate oral agreements providing that Stoker would jointly develop all of the residential portions of the Sandy Creek and Willis Creek properties, respectively; the agreements were allegedly breached when, near the completion of the development of the residential property, Stoker was informed that he could no longer participate in the remaining parcels. At the time of the alleged breach, several residential subdivisions of the larger properties remained to be developed. The majority held that any such agreement was barred by the Statute of Frauds.

(a) Stoker claims an exemption to the Statute of Frauds based on partial performance, in that he had already developed many of the residential tracts that make up Sandy Creek and work had commenced on almost all phases of Sandy Creek. The majority concluded that there was nothing contained in the individual written LLC agreements that was inconsistent with the lack of an overarching

contract and therefore there was insufficient evidence of partial performance to take the agreement outside of the Statute of Frauds. See *Studdard v. George D. Warthen Bank*, 207 Ga. App. 80 (427 SE2d 58) (1993).[7] But the majority's focus on the individual LLC agreements is too narrow and there are aspects of the partial performance that are inconsistent with the lack of a broader contract.[8]

The majority relies on the rule, correctly stated, that in order to remove the alleged oral contract from the Statute of Frauds, "*the part performance* shown must be consistent with the presence of a contract and inconsistent with the lack of a contract." (Emphasis supplied.) Majority opinion at 821. The majority concludes that Stoker's part performance is consistent with the presence of a contract; but then, with regard to the second part of the test, the majority focuses too narrowly on the individual agreements rather than Stoker's performance:

> The Stokers' joint development of some parcels pursuant to the written LLC agreements may be consistent with an oral agreement to develop the larger tract, but there is nothing *in the LLC agreements* which is inconsistent with the lack of such an oral agreement. [Cit.] *The written LLC agreements* in which the Stokers participated referred only to the development of the specific parcels acquired and developed under those agreements and did not tend to prove that the Westbury group agreed to the oral contract the Stokers seek to enforce.

(Emphasis supplied.) Id. This is not the proper test. For this reason alone, the majority's result is not sound.

Moreover, there are several aspects of Stoker's part performance that are inconsistent with the lack of an overarching agreement. The first aspect is demonstrated by the manner in which the parties operated, as stated in the appellees' brief.

Stoker initially developed a portion of land controlled by the defendants by purchasing it himself, not as a part of any joint venture with the defendants. On this tract, Stoker received 100 percent of the

---

[7] The majority also found no fraud sufficient to remove the agreement from the Statute of Frauds. See OCGA § 13-5-31 (3).

[8] "The provisions of Code Section 13-5-30[, the Statute of Frauds,] do not extend to . . . cases: . . . [w]here there has been such part performance of the contract as would render it a fraud of the party refusing to comply if the court did not compel a performance." OCGA § 13-5-31 (3). "Performance" means of the contract, not just acts taken in preparation of performance. *Smith v. Davidson*, 198 Ga. 231, 232 (3) (31 SE2d 477) (1944). Part performance need only be established by a preponderance of the evidence. *Tidwell v. Garrick*, 149 Ga. 290, 291 (2) (a) (99 SE 872) (1919); *R. T. Patterson Funeral Home v. Head*, 215 Ga. App. 578, 584 (1) (451 SE2d 812) (1994).

profits. Afterward, as admitted by Bouverie, the president of Westbury, the defendants discussed inviting Stoker to co-develop the residential properties with them:

> So it said to me, well, you know, okay, Mr. Stoker is a good salesman, but we're very good at the planning and the organizing and getting all the permissions. So I discussed with Ed [Faircloth, vice president of Westbury] the fact that maybe we should approach Mr. Stoker about going into partnership where we played to our strengths, he played to his, and we moved forward on that basis.

The parties then co-developed a portion of the residential property known as Bellemeade I under Bellemeade, LLC. As the appellees state, the Bellemeade development became the template for those that followed:

> The Bellemeade Joint Venture Agreement established structure by which the parties developed Bellemeade I subdivision and formed a template for future joint venture development projects, as they were agreed upon. . . .

The template had four parts: "(1) the parties formed a limited liability company to acquire the property in phases; (2) the property was acquired and developed by the limited liability company; (3) the property was sold by the limited liability company; and (4) the profits were divided by the members 50/50." The parties used this template at least seven times over a greater than three-year period to develop portions of the two large tracts:

> Between June 1999 and September 24, 2002, the parties entered into a series of development projects for development of additional distinct areas of residential property. In each case, the project was documented in similar written agreements and the method of development was the same.

Tellingly, however, at the time they were signed, the LLC agreements did not identify the property to which they were applicable, and, moreover, not all parcels of the overall property were handled in the same manner or as described in the above four-step process. As the appellees admit, a new joint venture/LLC *was not created* for each newly identified portion of the overall tract. Rather, if a newly identified area was considered "an additional phase" of an existing development, *it was added to the existing joint venture/LLC*. As stated in the appellees' brief,

Property to be added to an existing Joint Venture as an additional phase was taken down by the existing Joint Venture. When property was to be in a new development, a new joint venture was formed.

The parties had "partially performed" in this manner for more than three years until the dispute arose.

For instance, Stoker participated in the development of "Bellemeade," through the Bellemeade, LLC, by co-developing six individual portions of a larger parcel with individual names such as Oxton Plantation Sections 3, 4, and 5, and Bellemeade Section 1, Section 2, and Section 3-Phase 1. Indeed, Bellemeade, LLC was formed on June 21, 1999, and, when signed, the Bellemeade LLC agreements did not even identify the specific parcel to be developed first. But the parties did identify the entire tract available and the LLC purchased and developed the six individual parcels of that tract over the course of three years: in August 1999, May 2001, November 2001, February 2002, May 2002, and June 2002.[9] This "part performance" is inconsistent with the lack of an overarching agreement as to what properties were intended for development under the Bellemeade, LLC. The other LLCs were treated in a similar manner.

Second, also admitted by the appellees, is the fact that the parties proceeded with a lack of complete formality with regard to the individual joint venture/LLCs, which suggests the parties had an overarching agreement. As stated in appellees' brief, in some instances the parties proceeded regardless of whether individual agreements were signed and possibly, in one case, with no joint venture agreement at all:

> [W]hile not all of the agreements were signed and no one has located a Bousto Venture Agreement, it is undisputed that the parties entered into virtually identical agreements for each of the residential developments, that each of the residential subdivisions was developed under the umbrella of one or another of the Joint Ventures, and that the Parties went by the written agreements regardless of whether they were signed.

As illustrated above, in many other instances, the parties proceeded with development of individual parcels without including a descrip-

---

[9] But, after the dispute arose, Westbury refused to allow Bellemeade, LLC to participate in the development of Bellemeade "Section 3-Phase 2."

tion of the applicable land in their agreements. In fact, the appellees concede that:

> when a tract of land was identified for development by an LLC to be formed, some of the Defendant parties and the Plaintiffs would enter into a Joint Venture Agreement which referenced as Exhibit "A" the tract to be developed. *No Exhibit "A" was initially attached to any of the Joint Venture Agreements. . . .*

That the parties continued to develop parcel after parcel without signing documents and without even formally referencing which tract pertained to each agreement is circumstantial evidence inconsistent with the lack of an agreement between the parties controlling the overall development of the residential property.

Third, Bellemeade, LLC, and therefore Stoker, had participated in development activity with regard to some of the remaining parcels. Bellemeade, LLC paid invoices for the development of Section 3-Phase 2 before the dispute between the parties developed. Bellemeade, LLC had only one checking account and the money deposited therein was not segregated to distinguish between money intended for the two different phases. After the dispute arose, the appellees took steps to remove from the Bellemeade, LLC checking account money that they considered belonged to Cochran on the grounds that it was slated for use in developing Phase 2, from which Stoker was now excluded.

Finally, the change in how Stoker participated in the residential development must be considered. Stoker developed the first parcel by himself: he purchased it, developed it, and kept 100 percent of the profits. Despite the fact that there is evidence that the appellees claim that they did not prohibit Stoker from continuing to develop the properties on his own, the parties, thereafter, developed the properties as joint ventures with Stoker now receiving 50 percent of the profits. Also, Westbury and Casa admit they never considered using anyone other than Stoker as a partner in the development of the residential property for the more than three-year span, until Stoker alleged that Westbury was reporting excessive costs.

Taken together, the above facts present circumstantial evidence that the parties had an overarching agreement that provided how individual properties would be handled depending on whether they were considered part of an existing development, that the parties would always use the same template for managing each project, and that Stoker was the sole joint venturer identified for the residential

development. As such there is at least some evidence of part performance inconsistent with the lack of an agreement between the parties controlling the overall development of the entire residential property sufficient to take that question and all related questions regarding the alleged agreements to the jury.

(b) The appellees argue that two clauses found in the individual LLC agreements preclude the existence of an overall agreement between the parties. Each joint venture agreement includes a merger clause that provides that the agreement contains the entire agreement of the parties "relating to the matters provided herein, and no representation or warranty not expressly contained or incorporated by reference herein shall be binding on any party hereto." Each operating agreement includes a clause that provides that the parties are free to compete in any "other" business or activity:

> [N]othing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and no Member shall be accountable to the Company or to any other Member with respect to that business or activity even if the business or activity competes with the Company's business. The organization of the business shall be without prejudice to the Members' respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefor[ ]. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

But, as shown above, there is an issue of fact as to whether the parties entered into an overarching agreement and, therefore, as to whether the parties intended that the two clauses in the individual LLC agreements pertained to the overarching agreement. See *Center State Farms v. Campbell Soup Co.*, 58 F3d 1030 (4th Cir. 1995) (applying South Carolina law). In that case, Center State Farms alleged an indefinite oral agreement under which it would raise turkeys for Campbell Soup. One of Campbell Soup's defenses was that each of a series of individual written contracts — signed separately for each flock of turkeys — contained an integration clause in which the parties agreed that the contract comprised "the entire agreement between the parties." The Fourth Circuit held that there was evidence from which a jury could conclude that the individual contracts did not constitute the entire arrangement between the

parties, "and thus each integration clause of these individual contracts did not preclude evidence of an overarching oral agreement between the parties." Id. at 1033. The same holds true here.

Thus, the question of whether the parties entered into an overarching agreement regarding the development of the residential property, as well as what the terms were and whether any such agreement was breached, should be submitted to the jury.

3. In Count 6 of the restated complaint, Stoker alleges that "[a]s parties to the joint venture agreements," and "[a]s members of the Development LLCs," the defendants Bouverie, Westbury and Benjh owed him a fiduciary duty and breached it. The specific allegations at issue on appeal are that the defendants usurped individual LLC opportunities by developing portions of land slated for development by the individual LLCs, converted LLC assets, and improperly excluded Stoker from LLC affairs. The majority concludes that the above-quoted clause regarding "other business or activity" found in each LLC operating agreement freed the defendants from any duty they might otherwise have had to the LLC not to compete against it. But this conclusion fails to take into account the facts presented.[10]

In the above-quoted provision that allows the members of the LLCs to compete in "other" business or activities, the obvious question is what constitutes "other" business and activities. The question is difficult to answer given that when an LLC was formed, the parties did not indicate the individual parcels to which it applied although they budgeted for the development of an entire identifiable tract of land. The parties added parcels to individual LLCs, as shown in an example above, for several years after the LLC agreements were signed. Thus, the meaning of "other" in the clause quoted above is ambiguous at best, creating a jury issue.

For example, applying the majority's reasoning, the members of Bellemeade, LLC were free to develop a parcel known as Bellemeade "Section 3-Phase 2," despite the fact that the parcel was part of a parcel that was being developed by the LLC, and despite the fact that Phase 2 was already slated to be developed by Bellemeade, LLC before the parties developed a disagreement. As already explained, there is evidence to show that at the time Bellemeade, LLC was initially formed, it was slated to include *all* three sections of Bellemeade Plantation, and that a budget was drawn up at that time for all of that property. Under the majority's holding, any member of any of the LLCs could at any time take any of the business that the LLC

---

[10] I agree with the majority's analysis and conclusion regarding the Stoker member's right of a direct action in this case.

was already engaged in doing, and take money out of LLC accounts if it decided it wanted to develop the property itself.

Moreover, the same LLC operating agreement provides that the purpose of the Bellemeade, LLC was, among other things, to "accomplish any lawful business whatsoever which at any time appears to the Manager conducive to or expedient for the protection or benefit of the Company and its property," a very broad definition of the "business and activity" of the LLC. The term of the agreement was through July 1, 2096, unless sooner terminated pursuant to the agreement. And the parties identified the entire Bellemeade area on a plat before the first parcel was purchased. The broad definition, lengthy term, and comprehensive plat would appear to reflect the parties' intent that Bellemeade, LLC should develop all properties deemed by the parties as related to the Bellemeade development whenever they should be determined to be ripe for development.

A member of an LLC is an agent of the entity unless managers are appointed. OCGA § 14-11-301. A member or manager must act "in a manner he or she believes in good faith to be in the best interests of the limited liability company. . . ." OCGA § 14-11-305. And a member may have other fiduciary duties as provided "at law or in equity" to the LLC or other members. OCGA § 14-11-305 (4).[11]

> As interpreted by the Supreme Court of Georgia, the business opportunity principle "precludes acquisition by corporate officers of the property of a business opportunity in which the corporation has a beachhead in the sense of a legal or equitable interest or expectancy growing out of a preexisting right or relationship." (Citation and punctuation omitted.) *Southeast Consultants v. McCrary Engineering Corp.*, 246 Ga. 503, 508 (2) (273 SE2d 112) (1980) (an inchoate opportunity to bid on a public works contract was a business opportunity where it was within scope of former employer's business and employer had done a preliminary study of the project and had been invited to bid on the project).

*Jenkins v. Smith*, 244 Ga. App. 541, 542 (535 SE2d 521) (2000).

Thus there is an issue of fact as to whether the defendant/appellees breached their duties to the individual LLCs pursuant to the duties owed to each under the applicable LLC agreement or as otherwise provided by law or in equity.

I am authorized to state that Judge Barnes joins in this dissent.

---

[11] A nonmanager member does not have any duty to the LLC. OCGA § 14-11-305 (1).

DECIDED FEBRUARY 16, 2005 —
RECONSIDERATIONS DENIED APRIL 14, 2005 — █

*Martin, Snow, Grant & Napier, John T. McGoldrick, Jr., Michael M. Smith, William H. Larsen, Walter E. Harrington, Jr., Shirley R. Watson*, for appellants.

*Walker, Hulbert, Gray, Byrd & Christy, John G. Walker, Charles W. Byrd, Gambrell & Stolz, Robert G. Brazier, Steven G. Hall, Seaton D. Purdom*, for appellees.